UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at KNOXVILLE


EDWARD L. HARRIS            )
                                      )
       *Petitioner*,          )
                                        )
v.                              )     No. 3:97-cv-407
                                        )     *Jordan*
                                        )
RICKY BELL, Warden         )
                                        )
       *Respondent*.      )


## **<u>MEMORANDUM</u>**


       This is a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner Edward L. Harris ("Harris").  The matter is before the court on the motion for partial summary judgment and the amended motion for summary judgment, filed by the Attorney General for the State of Tennessee on behalf of the respondent, and Harris' responses thereto.  For the following reasons, the respondent's motion for summary judgment will be **GRANTED** to the extent set forth herein, and, for the reasons set forth below, a majority of Harris' claims will be **DENIED**.  As noted, respondent should file his answer or other response with respect to the remaining claims.

I.      Procedural History and Factual Background

The State has provided the court with copies of Harris' state court proceedings. [Court File No. 6, Notice of Filing of Documents, Addenda 1-19; Court File No. 47, Amended Notice of Filing of Documents, Addendum 2A (Transcript of Pre-Trial Hearing on April 18, 1988); Court File No. 48, Amended Notice of Filing of Documents, Addendum 2B (Supplemental Transcript of Proceedings on May 12, 1988, regarding statements to agent David Davenport)].

Harris, alias "Tattoo Eddie," was convicted in Sevier County, Tennessee, of one count of armed robbery, for which he received a sentence of life imprisonment, and two counts of first degree murder, for which he was sentenced to death.  His convictions and sentences were affirmed on direct appeal.  *State v. Harris*, 839 S.W.2d 54 (Tenn. 1992), *cert. denied*, 507 U.S. 954 (1993).  He was also denied post-conviction relief.  *Harris v. State*, 947 S.W.2d 156 (Tenn. Crim. App. 1996), *permission to appeal denied*, *id.*  (Tenn. 1997).

During the pendency of the case, the experts hired by the parties, as well as the expert appointed by the court, determined that petitioner is mentally retarded.  Also during the pendency of the case, the Tennessee Supreme Court and the United States Supreme Court determined that, under their respective constitutions, persons meeting the criteria for mental retardation are not eligible for the death penalty.  As a result, the Criminal Court for Sevier County, Tennessee, upon agreement of counsel for petitioner and the State, modified petitioner's two death sentences to consecutive sentences of life imprisonment.

The facts that led to Harris' convictions are set forth in detail in the opinion of the Tennessee Supreme Court on direct appeal, 839 S.W.2d at 59-63, and summarized by the Tennessee Court of Criminal Appeals in post-conviction proceeding as follows:

> The appellant was convicted of the September 13, 1986, murders of two employees of the Rocky Top Village Inn in Gatlinburg. Also charged in the murders were Kimberly Pelley, the appellant's girlfriend; Joseph DeModica[1], a Georgia state penitentiary acquaintance of the appellant; and transvestite, Rufus Doby, also known as Ashley Silvers. At trial, two key sources of evidence for the State were the testimony of the co-defendant, DeModica, which implicated the appellant in the murders, and a letter describing the murders, recovered in a phone booth near the police station in Maggie Valley, North Carolina.
>
> At trial, Joseph DeModica testified that, on the day of the murders, he, Doby, Pelley, and the appellant drove to Gatlinburg. Following a visit to the Great Smoky Mountains National Park, the group drove to the Rocky Top Village Inn. DeModica observed the appellant, Pelley, and one of the victims, Melissa Hill, enter the motel room in which Hill's body was subsequently discovered. Pelley carried a knife in her hand. DeModica remained in the parking lot. He heard several screams. A security guard, Troy Valentine, arrived, but encountered the appellant, who had come out of the motel room. Valentine and the appellant began to fight. Pelley also came out of the motel room, took the guard's flashlight, and struck him over the head with it. The appellant and Pelley then dragged Valentine into the motel room. DeModica heard two gunshots. He testified that, when the appellant and Pelley again came out of the motel room, they looked as if someone had sprayed them with red paint.
>
> The State presented evidence to corroborate various aspects of DeModica's testimony. For example, with respect to the knife that DeModica observed in Pelley's hand, an acquaintance testified that the appellant carried a lock-blade knife and a hunting knife with a serrated edge. Moreover, each victim suffered a deep neck wound from a serrated knife. Each victim had also

---

[1]The Tennessee Court of Criminal Appeals and the Tennessee Supreme Court refer to this individual as Joseph DeModica. Other references in the record, and Harris in his habeas petition, spell the last name as Demodica.

been shot in the head. The massive amount of blood at the crime scene and the number of injuries inflicted upon each victim were consistent with DeModica's description of the appellant and Pelley following the murders. Finally, DeModica knew that Valentine had been clubbed with his flashlight. This information was not released to the media and would have been known only to the killers.

The Maggie Valley letter, which was found three days after the murders, also contained information which only the killers would have known. The State's document examiner excluded DeModica, Pelley, and Silvers as the writer of the letter. Expert testimony further established strong indications that the appellant wrote this letter. A former girlfriend of the appellant, Antonia Jones, identified the handwriting in the Maggie Valley letter as being that of the appellant.

Following his arrest, the appellant made a series of statements to Tennessee Bureau of Investigation agents and Georgia law enforcement officers. Initially, the appellant denied going to Gatlinburg. However, he subsequently stated that he and his companions had eaten in a restaurant in Pigeon Forge, and that, while he and Pelley were in Gatlinburg with DeModica and Silvers, he had purchased a chain for Pelley. He denied participating in the killings and implied that DeModica and Silvers were the murderers.

The appellant did not testify at the guilt phase of his trial. Essentially, his defense, as advanced through the appellant's statements to the police following his arrest, was a denial of any participation in the crime. However, reviewing the sufficiency of the evidence on direct appeal, the supreme court remarked that "the overwhelming evidence supported the verdict of the jury...." Similarly, the post-conviction court observed, "And the proof came in. The proof continued to come in.... This evidence as it rolled in, was overwhelming."

*Harris v. State*, 947 S.W.2d at 161-62 (quoting *State v. Harris*, 839 S.W.2d at 76).[2]

---

[2]In separate trials, Joseph DeModica and Kimberly Pelley were each convicted of two counts of first degree murder, for which each was sentenced to life imprisonment, and one count of armed robbery. *See, respectively, State v. DeModica*, 1990 WL 21233 (Tenn. Crim. App. March 9, 1990), *permission to appeal denied, id.* (October 1, 1990); *State v. Pelley*, 1989 WL 147522 (December 8, 1989), *permission to appeal denied, id.* (March 5, 1990). It appears from the post-conviction record that Rufus Doby/Ashley Silvers pleaded guilty to armed robbery and was sentenced to 25 years.

Harris has set forth a multitude of claims, many with subparts, challenging his convictions and sentences of death. The Attorney General contends the respondent is entitled to judgment as a matter of law based upon procedural default and upon the findings of the Tennessee state courts. In addition, the court notes that, because his two death sentences have been modified to consecutive sentences of life imprisonment, a number of Harris' claims are now moot. The court will refer to Harris' claims set forth in his amended habeas corpus petition by their numeric paragraph designation assigned by Harris.

II.     Moot Claims

The court finds that the following claims, which pertain to the imposition of petitioner's death sentences, are moot and will therefore be denied as moot. In instances where a claim contains subparts, some of which are moot and other not, the claim is referenced with only the moot subpart set forth.

**83.     Before, during, and/or after Petitioner's trial the State violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. These unconstitutional violations include, but are not limited to, the following:**

**a.     T.C.A. §39-2-203(f)[3] and (g) provides insufficient guidance to the jury concerning who has the burden of proving whether mitigation outweighs aggravation and what**

---

[3]Tenn. Code Ann. § 39-2-203 was repealed by Acts 1989, ch. 591 § 1; the new law has been codified at Tenn. Code Ann. § 39-13-204.

standard of proof the jury should use in making that determination.

b.    T.C.A. §39-2-203 does not sufficiently narrow the population of defendants, convicted of first degree murder, who are eligible for a sentence of death.

c.    T.C.A. §39-2-203 does not sufficiently limit the exercise of the jury's discretion because, once the jury finds aggravation, it can impose the sentence of death no matter what mitigation is shown.

d.    T.C.A. §39-2-203 insufficiently limits the exercise of the jury's discretion by mandatorily requiring the jury to impose a sentence of death if it finds the aggravating circumstances to outweigh the mitigation circumstances.

e.    T.C.A. §39-2-203 allows the jury to accord too little weight to non-statutory mitigating factors and limits the jury's options to impose the sentence of life.

f.    T.C.A. §39-2-203 does not require the jury to make the ultimate determination that death is the appropriate punishment.

g.    T.C.A. §39-2-203 does not inform the jury of its ability to impose a life sentence out of mercy.

h.    T.C.A. §39-2-203 provides no requirement that the jury make findings of facts as to the presence or absence of mitigating circumstances, thereby preventing effective review of appeal under T.C.A. §39-2-205(c).

i.    The imposition of the sentence of death pursuant to T.C.A. §39-2-203 is cruel and unusual punishment.

j.    The proportionality and arbitrariness review conducted by the Tennessee Supreme Court pursuant to T.C.A. §39-2-205 is inadequate and deficient, in part because the Court did not consider all mitigating evidence presented at trial.

k.     **T.C.A. §39-2-203(c) permits the introduction of relatively unreliable evidence in the State's proof of aggravation or rebuttal of mitigation.**

l.     **T.C.A. §39-2-203(d) allows the State to make final closing arguments to the jury in the penalty phase.**

m.     **T.C.A. §39-2-203(h) prohibited the jury from being informed of the consequences of its failure to reach a unanimous verdict in the penalty phase.**

85.     In violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the statutory provisions and actual practices that govern appellate review of death sentences in Tennessee, and that were utilized in reviewing petitioner's sentence of death on appeal:

a.     **Denied Petitioner a fundamentally fair hearing on appeal on the issue of whether he should live or die;**

b.     **Denied Petitioner adequate and fair notice of the facts and criteria relief upon by the Supreme Court of Tennessee in determining whether he should live or die;**

c.     **Denied Petitioner a reliable determination - free from arbitrariness, caprice and prejudice - of the issues of whether he should live or die;**

d.     **Denied Petitioner the effective assistance of counsel on appeal;**

e.     **Failed to consider and weigh all mitigating evidence, including, e.g., evidence of Petitioner's drug problems;**

f.     **Failed to compare the facts and the sentence to those in other similar cases, i.e., to conduct a meaningful proportionality review;**

g.     **Did not have complete information before it in the trial court's report before performing such review;**

>  h.   Had no comprehensive information upon which to find arbitrariness in sentencing;
>
>  i.   Failed to consider the arbitrary factors influencing the jury including outside influences, the introduction of inflammatory pictures, and inflammatory argument by the prosecutor.

86. The jury instructions in this case at the guilt phase violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. These unconstitutional jury instructions include, but are not limited to, the following:

>  f.   Instructions on an aggravating circumstance that duplicated an element of the crime itself.
>
>  g.   Instructions which required the jury to give weight to non-statutory aggravating factors, e.g., Tr. 1529.

87. The jury instructions in this case at the penalty phase violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. These unconstitutional jury instructions include, but are not limited to, the following:

>  a.   Instructions that shifted the burden of proof to Petitioner to show the existence of mitigating circumstances.
>
>  b.   Instructions on aggravating circumstances which failed to narrow the class of persons eligible for the death penalty and to provide meaningful detained guidance to the jury, including "murder during the course of a felony" aggravating circumstance and the "heinous, atrocious, or cruel" aggravating factor.
>
>  c.   Instructions that diminished the jury's responsibility for imposing the death penalty.
>
>  d.   Instructions on an aggravating circumstance which were vague and over broad as applied in Petitioner's case and

which did not adequately channel the jury's discretion and invited arbitrary, capricious, and inconsistent application of the death penalty.

e.     Instruction on an aggravating circumstance that duplicated an element of the crime itself.

f.     Instructions which required the jury to give weight to non-statutory aggravating factors, e.g. Tr. 1529.

88.     The State violated Petitioner's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because it has failed to demonstrate that, in light of Petitioner's fundamental right to life, the death penalty is necessary to promote any compelling state interest and is the least restrictive means of achieving any such interest.

89.     The State violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because electrocution constitutes cruel and unusual punishment which does not comport with the evolving standards of decency of a civilized society.  Petitioner alleges that execution by electrocution violates the Eighth Amendment to the Constitution.  [Subparts a-e with case law are omitted].

92.     In violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, the Tennessee death penalty statute is based upon an unconstitutional standard.

93.     Execution of the Petitioner would violate the Eighth Amendment because Petitioner is incompetent to be executed.

94.     The death penalty is imposed in Tennessee in an arbitrary, capricious, and irrational manner that shocks the conscience and is based on racial, gender-based, economic, and geographic discrimination and is inconsistent with sentences imposed in similar cases in Tennessee.  In

**these circumstances Petitioner's sentence violated the Eighth and Fourteenth Amendments to the United States Constitution.**

**95.     Tennessee's death penalty lacks any constitutional, moral or penalogical justification, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of The United States Constitution.**

**96.     In violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, the jury considered non-statutory aggravating circumstances**.

III.     <u>Procedural Default</u>

The Attorney General contends that a majority of Harris' claims are procedurally defaulted. The doctrine of procedural default is an extension of the exhaustion doctrine. A state prisoner's petition for a writ of habeas corpus cannot be granted by a federal court unless the petitioner has exhausted his available state court remedies. 28 U.S.C. § 2254. This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971). *See also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (Exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review."). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

Harris cannot file another state petition for post-conviction relief. Tenn. Code Ann. § 40-30-102(a). Accordingly, he has no remedy available to him in the Tennessee state courts for challenging his conviction and is deemed to have exhausted his state remedies.

It is well established that a criminal defendant who fails to comply with state procedural rules which require the timely presentation of constitutional claims waives the right to federal habeas corpus review of those claims "absent a showing of cause for the non-compliance and some showing of actual prejudice resulting from the alleged constitutional violation." *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977). *Accord Engle v. Isaac*, 456 U.S. 107, 129 (1982) ("We reaffirm, therefore, that any prisoner bringing a constitutional claim to the federal courthouse after a state procedural default must demonstrate cause and actual prejudice before obtaining relief.").

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

"When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). Therefore, to excuse his procedural default, Harris must first demonstrate cause for his failure to present an issue to the state courts. "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can

show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

Harris acknowledges that a number of his claims were never raised in the state courts. He alleges, however, that the State of Tennessee failed to provide him a full and fair opportunity to challenge the federal constitutional errors which he claims infected his convictions and sentences of death. According to Harris, the State denied him the resources he required in order to discover the facts he has presented in his habeas corpus petition and thus obstructed his efforts to obtain state court review of his convictions and sentences.

This court has reviewed the record of Harris' trial [Addendum 1, Technical Record; Addendum 2, Transcript of the Evidence, vol. I-XX; Addendum 3, Exhibits to Pretrial Motions] and post-conviction proceedings [Addendum 11, Technical Record; Addendum 12, Transcript of the Evidence, vol. 1-2]. The court finds that plaintiff had a full and fair opportunity to present the issues which were procedurally defaulted and thus he has failed to demonstrate cause to excuse his procedural default.

As Harris lacks cause for his state procedural default, this court need not consider whether petitioner would be prejudiced by his inability to raise the claims in these proceedings. *McCleskey v. Zant*, 499 U.S. 467, 502 (1991); *Murray v. Carrier*, 477 U.S. at 494 (Supreme Court rejected proposition that showing of prejudice allows relief in the absence of cause).

Harris also claims his procedural default should be excused because to do otherwise would result in a miscarriage of justice based upon the conviction of a factually innocent

person.  "Briefly stated, a fundamental miscarriage of justice occurs when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent."  *Mitchell v. Rees*, 114 F.3d 571, 579 n.12 (6th Cir. 1997) (citations omitted).  Harris, however, has failed to demonstrate that he is actually innocent of the crimes for which he was convicted.

The court finds that the following claims are procedurally defaulted, either by petitioner's failure to raise them at all in the state courts, or if raised in the trial court, then having been abandoned when not raised on appeal to the Tennessee Supreme Court or Tennessee Court of Criminal Appeals, or, where noted, having been raised only as state law claims or conclusory allegations without supporting facts.  In instances where a claim contains subparts, some of which are procedurally defaulted and others not, the claim is referenced with only the defaulted subpart set forth.

**78.    In violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, the trial court's instructions at the guilt and sentencing phases equated "reasonable doubt" with an "honest doubt which ... will not permit your mind to rest as to the certainty of guilt," or a doubt which was not merely possible or imaginary.  Tr. 1453.  These instructions unconstitutionally relieved the prosecution of its burden of proof.  Petitioner is, therefore, entitled to a new trial and sentencing hearing.  *See e.g., Rickman v. Dutton*, 864 F.Supp. 868 (M.D. Tenn. 1994).**

**80.    In violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, Petitioner was denied the effective assistance of counsel at the guilt phase of trial, the sentencing phase of trial, on appeal, and in post-conviction proceedings.  In particular counsel failed to perform reasonably, and there is a reasonable probability, sufficient to undermine confidence in the outcome of trial, sentencing, appeal, and post-conviction**

proceedings, that, had counsel performed reasonably, Petitioner would not have been convicted or sentenced to death, and/or would have received relief on appeal or in post-conviction proceedings. Specifically, counsel was ineffective for the following non-exclusive list of reasons:

c.      Counsel was ineffective for failing to investigate and/or demonstrate that Mr. Harris suffered severe, pervasive, and long-standing brain damage, and that such brain damage rendered Mr. Harris unable to conform his conduct to the requirements of the law and/or substantially impaired his ability to do so. Counsel was ineffective for failing to demonstrate that Mr. Harris was mentally retarded.

d.      Counsel suffered from an undisclosed and irreconcilable conflict of interest. Within days after the subject offenses, Joseph Charles Demodica and Rufus Edward Doby, Petitioner's co-defendants, were arrested in Gatlinburg, Tennessee. At the time of their arrest they were driving the stolen white Toyota allegedly used in the subject offenses. In their possession were items stolen from the Father Ryan Catholic School in Nashville, Tennessee. They were charged with possessing such items of stolen property. Their story at the time was that the Petitioner, who was not present, had stolen those items. At the time of their arrest they were specifically questioned regarding the murders of Mr. Valentine and Mrs. Hill. They were given a lie detector test regarding those murders. Their story was that they were not in Gatlinburg at the time of the murders, a story standing in stark contrast to Mr. Demodica's testimony at Petitioner's trial. Mr. Charles Sexton was the attorney appointed to represent Mr. Demodica and Mr. Silvers on these charges. At Petitioner's trial Mr. Sexton failed to impeach Mr. Demodica with the prior inconsistent statement he made at the time he was being represented by Mr. Sexton or with the prior inconsistent statements made by Mr. Demodica to Mr. Sexton during the course of Mr. Sexton's representation. At the time of state post-conviction proceedings Mr. Sexton was an officer of the State of Tennessee, i.e., an elected judge, and had an affirmative duty to reveal his conflict of interest. The failure of Mr. Sexton to reveal that conflict prevented the same from being presented

to the state courts of Tennessee. Moreover, under the circumstances, such conflict was not discoverable through the exercise of due diligence. Finally, the State of Tennessee failed to provide Petitioner with the resources to discover that conflict of interest. In all instances the actions of the State of Tennessee constituted cause to excuse Petitioner's failure to present this claim to the state courts of Tennessee.

e.      To the extent that it was available through the exercise of due dilligence [sic], counsel failed to present the exculpatory evidence set forth in Paragraph 79.

f.      Counsel failed to move for a directed verdict as to the offenses [sic] of common law murder in the first degree when the State failed to introduce *any* evidence to support the statutory element of deliberation.

g.      ... Counsel failed to secure the appearance and testimony of a crime scene investigation expert to testify that: (1) there was very little probability and/or likelihood that unidentified hairs found on the body of victim Valentine and elsewhere at the crime scene could have been deposited in the manner alleged by the State or, for that matter, in any manner consistent with Mr. Harris' alleged guilt; and (2) there was very little probability and/or likelihood that Mr. Harris could have been involved in the fight with Mr. Valentine described during Mr. Demodica's testimony without leaving hair or trace evidence, contrary to the theory of the State. ... [The omitted allegations are addressed elsewhere in this opinion].

h.      Counsel failed to develop a reasonable trial strategy or defense for petitioner.[4]

i.      Counsel failed to investigate and present all available evidence that would support petitioner's claims of innocence

---

[4] This claim was pleaded in a conclusory fashion, without supporting facts or allegations, and thus is procedurally defaulted for that reason.

15

regarding all charges including, but not limited to, the first degree murder charges.[5]

j.      Counsel failed to properly rebut the State's case at both the guilt phase and the sentencing phase of trial.[6]

k.      Counsel failed to prepare adequately for either the guilt phase or the penalty phase of trial and to develop and present to the jury a coherent theory of defense at either phase.[7]

l.      Counsel lacked the experience and knowledge necessary for effective representation of Petitioner in a death penalty case.[8]

m.      Counsel failed to conduct, and/or was prevented by the trial court from conducting, a meaningful voir dire sufficient to discover and remove biased jurors or to prevent the removal for cause of unbiased jurors. Alternatively, the trial court failed and/or refused to conduct a meaningful voir dire sufficient to discover and remove biased jurors, or to prevent the removal for cause of unbiased jurors. No inquiry was made regarding whether jurors who favored capital punishment would follow the law. Furthermore, when Jurors Mynatt, Carr, Reagan, Gibson, Vandergriff, Norton, Hampton, Newman, Jones, Blalock, Gillespie, Cates, and Peerman, indicated a generalized opposition to the imposition of the death penalty, no adequate inquiry was made to determine whether such jurors were excludable

---

[5]This claim was pleaded in a conclusory fashion, without supporting facts or allegations, and thus is procedurally defaulted for that reason.

[6]This claim was pleaded in a conclusory fashion, without supporting facts or allegations, and thus is procedurally defaulted for that reason.

[7]This claim was pleaded in a conclusory fashion, without supporting facts or allegations, and thus is procedurally defaulted for that reason.

[8]This claim was pleaded in a conclusory fashion, without supporting facts or allegations, and thus is procedurally defaulted for that reason.

under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

n.      **Counsel failed to exclude, and/or was prevented by the trial court from excluding, jurors whose opinions would lead them to impose the death penalty in every case or those jurors whose views would prevent or substantially impair the performance of their duties as a juror.**

o.      **Counsel failed to challenge for cause those jurors who by their answers showed some type of bias against the petitioner, his case, or any group or class to which the petitioner belongs.**

p.      **Counsel failed to file necessary motions before, during, and after trial, on direct appeal or on post-conviction.** [Harris' claim that his counsel failed to move to suppress the statement made by him to law enforcement was litigated in post-conviction proceedings and is considered by the court, infra].

q.      **Counsel failed to adequately advise Petitioner as to the consequences of his decision to testify and/or render advice sufficient to allow Petitioner to make an informed and conscious choice not to testify at either the quilt phase or penalty phase of trial or any prior post-conviction proceedings. ...** [The omitted allegations are addressed elsewhere in this opinion].

r.      **Counsel failed to assure Petitioner's presence at crucial stages during all prior proceedings. E.g., Tr. 1129.**

s.      **Counsel was ineffective for allowing Mr. Harris to speak with the trial court in a transcribed *ex parte* proceeding without being present. Counsel was also ineffective for failing to advise Mr. Harris of the consequences of doing so without benefit of counsel and while being recorded.**

t.      **Counsel failed to object to the prosecutor's improper, inflammatory, prejudicial, inappropriate, and misleading or inaccurate statements concerning the law, the evidence or the petitioner during voir dire, opening, direct examination,**

cross examination, closing, and rebuttal closing at the guilt phase of Petitioner's trial, and during opening, direct examination, cross examination, closing and rebuttal closing at the penalty phase of Petitioner's trial, e.g., (i) the prosecutor indicated that Mr. Harris had some burden to come forward with corroboration for the fact that he did not have a gun or knife, an impermissible comment on Mr. Harris' right to remain silent. (Tr. 1435); (ii) the prosecutor indicated that Mr. Harris had some burden to come forward with corroboration for the fact that the handwriting on the Maggie Valley note was not his, another impermissible comment on Mr. Harris' right to remain silent. (Tr. 1435); and, (iii) the prosecutor urged the jury to consider the impact of the crime on the victim, the victim's family, society and/or the victim's social, moral or religious worth.

u.      Counsel failed to object to jury instructions which shifted the burden of proof on malice, an element of the crime, to the petitioner.

v.      Counsel failed to object to inaccurate and misleading statements of law and comments by the trial judge.

w.      Counsel failed to object to jury instructions which limited the jury's individualized consideration of mitigating factors including, but not limited to, sympathy.[9]

x.      Counsel failed to object to the instruction by the Court defining rape and sodomy immediately following the definition of felony murder during the penalty phase of Petitioner's trial.[10]

y.      Counsel failed to have the court instruct the jury on the effect of their inability to agree on a sentence of death and/or

---

[9]Because Harris' death sentences were modified to life imprisonment, this claim is also moot.

[10]Because Harris' death sentences were modified to life imprisonment, this claim is also moot.

on the meaning of a life sentence or the petitioner's eligibility for any release.[11]

z.      Counsel failed to object to the jury's consideration of unconstitutional statutory aggravating circumstances and non-statutory aggravating circumstances at the penalty phase.[12]

aa.     Counsel failed to properly cross-examine the State's expert witnesses.

bb.     Counsel were ineffective for failing to properly and fully raise any or all of the claims in this petition either at trial, on direct appeal, or in post-conviction proceedings.

cc.     To the extent that counsel's failures were the result of adverse rulings and/or interference by the trial court and/or the State, counsel was rendered ineffective by the same.

81.     Either before petitioner's trial, during the guilt/innocence phase or penalty phase of his trial, or during post trial or post-conviction proceedings, the Court committed errors that violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendment to the United States Constitution. These unconstitutional errors include but are not limited to the following:

b.     The trial court failed and/or refused to allow Petitioner to investigate and present evidence to rebut a critical state witness, Antonia Jones, whose name was not revealed until four days before trial.

d.     The trial court violated Petitioner's rights by: failing to suppress a statement of the Defendant taken in violation of

---

[11]Because Harris' death sentences were modified to life imprisonment, this claim is also moot.

[12]Because Harris' death sentences were modified to life imprisonment, this claim is also moot.

his *Miranda* rights[13]; allowing a witness to relate statements allegedly made by the Defendant the evening before the offense[14]; discussing the penalty phase in opening remarks to the jury; exhibiting bias in comments at a bench conference; failing to suppress a statement of the Defendant given to police while being transported to Tennessee from Georgia; allowing the State to re-open its proof; commenting to the jury regarding the value of defense proof; allowing comment on uncharged misconduct of the Defendant and his travel companions[15]; and .... [The omitted allegation is addressed elsewhere in this opinion].

f.    The Court improperly failed to voir dire and exclude jurors whose attitudes toward the death penalty, the defendant, and aggravating and mitigating circumstances, would prevent or substantially impair the performance of their duties as a juror.

h.    The trial court violated Petitioner's rights in charging the jury: as to their duties if Defendant were found guilty; as to homicide and felony murder; by striking an insufficient portion of a charge; by erroneously giving Tennessee Pattern Instruction No. 20.01 (regarding inferences); by including the range of all punishments of all offenses; by failing to grant Defendant's request to charge Tennessee Pattern Instruction No. 37.17 (regarding identity); by charging the jury regarding flight and failing to alter the flight charge as requested; by failing to use the Tennessee Pattern Instruction for all homicide charges and failing to

---

[13]This claim apparently refers to Harris' statements to T.B.I. Agent David Davenport while he was being transported from Atlanta to Sevier County, Tennessee. Harris did not file a motion to suppress these statements and thus waived his right to challenge their admission. For that reason, this claim is procedurally defaulted.

[14]This claim apparently refers to Harris' statements to Tim Farmer, in whose apartment Harris and his co-defendants spent the night before the murders. Harris challenged the admission of these statements on the basis of state law. For that reason, this claim is procedurally defaulted.

[15]This claim and the preceding five claims were also raised as a matter of state law, with respect to Harris' allegations of judicial misconduct, and thus are procedurally defaulted.

provide said charges to the defense when requested by giving inadequate instructions during the penalty phase of Petitioner's capital trial.[16]

i.    The trial court violated Petitioner's rights by allowing Mr. Harris to speak with the court in a transcribed *ex parte* proceeding without counsel being present. The trial court also improperly failed to advise Mr. Harris of the consequences of doing so without benefit of counsel and while being recorded.

k.    The trial court knew of facts, e.g., Petitioner's inability to read and write, his history of treatment with anti-psychotic medication and/or his current treatment with anti-psychotic medication, his irrational and confused demeanor at trial, and his inability to comprehend the actions of his attorneys and/or court proceedings, which raised a bona-fide doubt regarding Petitioner's competency to stand trial, yet failed to conduct any proceeding to determine competency. Furthermore, Petitioner was incompetent at the time of trial.

l.    The trial court violated Petitioner's rights by allowing the prosecutor to make arguments which were unsupported by law or fact, including, but not limited to, asking the jury to consider victim impact and arguing that the victims pled for their lives.

m.    The trial court violated Petitioner's rights by allowing hearings and formal discussions of Mr. Harris' case in court in his absence without first obtaining a knowing and intelligent waiver of his constitutional right to be present.

o.    The Court denied Petitioner's pretrial, trial, post-trial and post-conviction motions, including but not limited to: motion to dismiss, motion for mistrial, and motion to strike testimony.

---

[16]These claims were raised in the Tennessee courts as matters of state law only and thus are procedurally defaulted.

p.     The Court kept relevant facts from the jury regarding Petitioner's sentence.[17]

q.     The Court allowed the jury to consider the impact of the crime on the victim or the victim's family.[18]

r.     The Court allowed the jury to consider non-statutory aggravating circumstances.[19]

s.     The Court interpreted the statutory aggravating circumstances to allow the introduction of improper evidence.[20]

u.     The trial court admitted highly prejudicial evidence of other crimes by Petitioner and in reviewing this error, the Tennessee Supreme Court engaged in an improper harmless error analysis. *See State v. Harris*, 839 S.W.2d 54, 81-84 (Tenn. 1992) (Reid, C.J. and Daughtrey, J., dissenting). Petitioner was denied a reliable sentencing determination because admission of such evidence failed to guide and channel the jury's decision and was further denied adequate appellate review of this issue.[21]

82.     Either before, during, or after Petitioner's trial, the prosecutor violated Petitioner's rights under the Fifth, Sixth, Eighth and

---

[17]Because Harris' death sentences were modified to life imprisonment, this claim is also moot.

[18]Because Harris' death sentences were modified to life imprisonment, this claim is also moot.

[19]Because Harris' death sentences were modified to life imprisonment, this claim is also moot.

[20]Because Harris' death sentences were modified to life imprisonment, this claim is also moot.

[21]This claim was raised in the Tennessee state courts as a matter of state law only and thus is procedurally defaulted.

Fourteenth Amendments to the United States Constitution. The unconstitutional violations include, but are not limited to, the following:

    a.    The prosecutor made improper, inflammatory, prejudicial, inappropriate, and misleading or inaccurate statements concerning the law, the evidence, or the petitioner during voir dire, opening, direct examination, cross examination, closing, and rebuttal closing at the guilt phase of Petitioner's trial, and during opening, direct examination, cross examination, closing and rebuttal closing at the penalty phase of Petitioner's trial, e.g., (i) the prosecutor indicated that Mr. Harris had some burden to come forward with corroboration for the fact that he did not have a gun or knife, an impermissible comment on Mr. Harris' right to remain silent. (T 1435); (ii) the prosecutor indicated that Mr. Harris had some burden to come forward with corroboration for the fact that the handwriting on the Maggie Valley note was not his, another impermissible comment on Mr. Harris' right to remain silent. (1435); and, (iii) the prosecutor urged the jury to consider the impact of the crime on the victim, the victim's family, society and/or the victim's social, moral or religious worth.

    86.    The jury instructions in this case at the guilt phase violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. These unconstitutional jury instructions include, but are not limited to, the following:

    b.    Instructions which informed the jurors about the punishment for the other non-murder offenses, which were prejudicial to their finding Petitioner guilty of murder and then sentencing him to death. E.g., Tr. 1463-64.

    c.    Instructions which informed the jurors that Petitioner could be convicted of felony murder without any proof of malice or intent to kill. Tr. 1450.

    91.    The state violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution

**because Petitioner was wrongly convicted of both felony murder and premeditated first degree murder for the same offense, in violation of due process and double jeopardy.**

**97.     Petitioner avers that the aforementioned United States Constitutional errors, when considered in combination with each other, constitute a fundamental denial of due process of law such that the petitioner is entitled to a new trial on guilt and punishment in this cause.**[22]

The foregoing claims will be denied on the basis of procedural default. With respect to the remaining claims for relief addressed on the merits in the motion for summary judgment, the Attorney General contends the respondent is entitled to judgment as a matter of law based on the findings of the Tennessee state courts.

IV.     <u>State Court Findings</u>

Pursuant to 28 U.S.C. § 2254(d), Harris may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law or (2) was not reasonably supported by the evidence presented to the state court. In addition, findings of fact by a state court are presumed correct and

---

[22]Although this claim was not addressed in respondent's amended motion for summary judgment, respondent argued in the first motion for partial summary judgment that this claim is procedurally defaulted.

Harris must rebut the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e).

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), clarified the distinction between a decision "contrary to," and an "unreasonable application of," clearly established Supreme Court law under § 2254(d)(1).  A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Id*. at 413.  A state court decision "involves an unreasonable application of clearly established Federal law" only where "the state court's application of clearly established federal law was objectively unreasonable."  *Id*. at 409.  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id*. at 411.

The following claims were considered on the merits by either the Tennessee Supreme Court on direct appeal or the Tennessee Court of Criminal Appeals in post-conviction proceedings.  They will be considered by this court on that basis.

**80.  In violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, Petitioner was denied the effective assistance of counsel at the guilt phase of trial, the sentencing phase of trial, on appeal, and in post-conviction proceedings.  In particular counsel failed to perform reasonably, and there is a reasonable probability, sufficient to undermine confidence in the outcome of trial, sentencing, appeal, and post-conviction**

proceedings, that, had counsel performed reasonably, Petitioner would not have been convicted or sentenced to death, and/or would have received relief on appeal or in post-conviction proceedings. Specifically, counsel was ineffective for the following non-exclusive list of reasons:

a. Counsel failed to fully investigate Mr. Harris' background and mental health history and use this information to support an argument that Mr. Harris was incompetent both at the time of trial and at the time of the offense, as well as to provide mitigating evidence at the sentencing phase of trial. Trial counsel, however, failed to perform, and/or was prevented from performing, a reasonable investigation, failed to find the following evidence, and consequently failed to present the following evidence to the jury, both during the guilt phase and during the sentencing phase of the trial. Counsel was ineffective and/or was rendered ineffective in the following ways:

i. Counsel failed to fully investigate Mr. Harris' background and mental infirmity, failing to adequately investigate and adequately prepare pre-trial mitigating factors and circumstances. Had counsel properly investigated, counsel would have had the following information which he could have used to support a defense at the guilt phase of trial, and which could and should have been used as mitigating evidence at the sentencing phase of trial, including, for example:

[Habeas counsel has here listed 33 examples of situations in Harris' background which allegedly affected his mental health].

b. Counsel was ineffective for failing to fully investigate and present relevant evidence of Mr. Harris mental health, and to secure adequate expert assistance to defend Mr. Harris. Counsel failed to retain a competent psychologist, psychiatrist, and/or other mental health professionals to examine Petitioner's social history, his current psychological condition, and the alleged circumstances of the offense. Proper investigation into Petitioner's mental condition

**would have revealed that Mr. Harris suffered from severe mental illness, including, but not limited to, serious brain damage and mental retardation. Competent mental health professionals would have testified that Petitioner was under the influence of extreme mental or emotional disturbance at the time of the offense, and that his ability to appreciate the wrongfulness of his conduct was substantially impaired as a result of his mental diseases and defects at the time of the offense, if indeed he was present at all. Competent mental health experts would have testified that Petitioner was not competent at the time of trial or at the time of the offense. Further, evidence of Petitioner's mental conditions constituted further grounds for suppression of his pre-trial statements.**

At the outset, the court notes that in *Strickland v. Washington*, 466 U.S. 668 (1984) the United States Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687.

To establish that his attorney was not performing "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771 (1970), petitioner must demonstrate that the attorney's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 687-88. In judging an attorney's conduct, a court should consider all the circumstances and facts of the particular

case. *Id*. at 690. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). A finding of serious attorney incompetence will not justify setting aside a conviction, however, absent prejudice to the defendant so as to render the conviction unreliable. *Id*. at 691-92.

Harris was represented at trial by Charles Sexton and William Goddard. *Harris v. State*, 947 S.W.2d at 164. Mr. Goddard was killed in an automobile accident eight days after the conclusion of Harris' trial. *Id*. n.5.

The trial court, in denying post-conviction relief, first noted that Harris' defense was that he was not present during the commission of the murders; the court then found, with respect to Harris' claim that his attorneys failed to investigate his mental health background, "that petitioner did not at any time furnish information to defense counsel nor did diligent counsel discover any justification to seek special support services consistent with the determined strategy and the defense chosen by the defendant." [Addendum 11, Technical Record of Post-Conviction Proceedings, p. 256, Judgment of Dismissal at 260].

The Tennessee Court of Criminal Appeals addressed the foregoing two claims of ineffective assistance of counsel in its discussion of the penalty phase of the trial. "Specifically, the appellant asserts that counsel failed to adequately investigate and obtain

available evidence regarding the appellant's background and mental condition." *Harris v. State*, 947 S.W.2d at 167 (footnote omitted).

The appellate court noted that Harris presented no proof, other than his own testimony, in support of mitigation. The court then observed that, while there is no legal requirement or established practice requiring proof of mitigation, "'[a] strategy of silence may be adopted only after a reasonable investigation for mitigating evidence or a reasonable decision that an investigation would be fruitless.'" *Id.* (quoting *Tafero v. Wainwright*, 796 F.2d 1314, 1320 (11th Cir. 1986)). The court further observed, however, "that the extent of investigation required depends critically upon information supplied by the defendant." *Id.*

> [W]hen the facts that support a certain line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Id.* (quoting *Burger v. Kemp*, 483 U.S. 776, 795 (1987)).

The Tennessee Court of Criminal Appeals then concluded that counsel's investigation of Harris' background was sufficient:

> In this case, defense counsel did not act "in a factual void in an unjustified manner." With respect to the appellant's background, Sexton testified at the post-conviction hearing that he spoke with the appellant "many, many times." Moreover, during an early interview, Sexton utilized a standardized eight to ten page form to gather background information from the appellant. Trial counsel acknowledged that he was familiar with the appellant's limited educational background and the fact that he had resided in institutions in North Carolina as a juvenile and in penal institutions as an adult. Sexton

testified that the appellant was "able to outline where he had been and ... why he was there." Sexton also contacted the appellant's mother in Georgia on two occasions. Defense counsel asked the appellant's mother to testify at the sentencing hearing. She refused to participate.

Sexton attempted to contact other individuals whose names were supplied by his client, but to no avail as they could not be found. Sexton testified at the post-conviction hearing that "it was hard to find somebody that would take an interest in this man, and would make an effort to come up here and ... and show some concern for him. And it got down to the point where it looked like it was just me and Bill Goddard, and nobody else was going to give a hoot about what happened to this man."

Thus, the appellant and his mother were the primary sources of background information relevant to the sentencing phase of the appellant's trial. Sexton indicated that the information obtained from the appellant and his mother suggested that further investigation would be unproductive. Sexton stated that if he "had thought anything would have helped this man, [he] would have had it [at the sentencing hearing]."

*Id.* at 167-68 (quoting *Knighton v. Maggio*, 740 F.2d 1344, 1350 (5th Cir. 1984)).

The findings of the appellate court are supported in the record. Mr. Sexton testified during the post-conviction hearing as to his discussions with Harris and his investigation of Harris' background, family history, and criminal record. [Addendum 12, vol. 1, pp. 105-113, Vol. 2, pp. 119-121].

The appellate court likewise determined that counsel did not render ineffective assistance by failing to request funds for investigative services.

Sexton admitted that defense counsel did not request funds for investigative services. However, "[u]nder certain circumstances, trial counsel's decision not to investigate family childhood background may legitimately be the product of a reasoned tactical choice. Given the particular circumstances of [a] case including, among other things, the fact that [a defendant] [is] thirty-one years old when he murder[s] [the victim], evidence of a deprived and abusive childhood is entitled to little, if any, mitigating weight." The

appellant in this case was approximately thirty years of age at the time of the murders.

*Id*. at 168 (quoting *Francis v. Dugger*, 908 F.2d 696, 703 (11th Cir. 1990)).

Regarding Harris' alleged mental infirmities, the Tennessee Court of Criminal Appeals determined there was no reason for counsel to have requested a mental evaluation.

> With respect to the appellant's mental health, Sexton testified that he and Goddard discussed the possibility of requesting a psychological evaluation of the appellant, but concluded that there was no evidence that any such evaluation was warranted. At the post-conviction hearing, Sexton testified:

>> But at no point in time, during this proceeding did I ever feel like Mr. Harris was less than competent. He always communicated with us. He was always very cooperative with us. He always talked very freely with us. Was able to understand the questions when we would ask them, was able to give us answers. And, frankly, was ... was as cooperative as you could ask him to be. In most areas. Now there were some things we had some difficulties with. But as far as him understanding, and having any mental deficiencies, I was never ... it really never became an issue ... with me.[23]

> We note that the post-conviction court also observed, "This court has noticed nothing to indicate anything to raise a question about this defendant's ability to understand these proceedings and defend himself, participate in them."[24] Finally, trial counsel testified that at no time during any pre-trial interview did the appellant mention a learning disability. Furthermore, the appellant never alluded to any psychological problems or any past treatment or institutionalization for psychological disorders.

---

[23]Mr. Sexton also testified that he and Mr. Goddard had discussed on a number of occasions whether Harris was competent and whether an evaluation should be done. [Addendum 12, Transcript of the Evidence, vol. 1, p. 101].

[24]The trial court first noted that "[t]his Court has observed Mr. Harris on many occasions .. many times. In this courtroom, in chambers, in chambers today, in chambers on other occasions, in open court." [Addendum 12, Transcript of the Evidence, vol. 2, p. 178].

Thus, we conclude that defense counsel's performance was constitutionally adequate at the penalty phase.

*Id*. at 168-69 (footnote omitted).

The appellate court's findings are supported in the record.  As noted, neither Mr. Sexton nor the trial court had any reason to doubt Harris' mental competency.

Based upon the foregoing, this court thus concludes that the state courts' determinations that Harris' attorneys did not render ineffective assistance of counsel with respect to Harris' background and mental health history was neither contrary to, nor did it involve an unreasonable application of, federal law as established by the U.S. Supreme Court in *Strickland v. Washington*.  Accordingly, Harris is not entitled to habeas relief on these issues, and these claims of ineffective assistance of counsel will be denied.

> **g.** **Counsel failed to request and obtain adequate expert and investigative assistance.  Counsel failed to secure the appearance and testimony of a handwriting expert from Atlanta, Georgia.  That expert had examined the handwriting of Messrs. Harris, Demodica, and Doby, and Ms. Pelley, and the Maggie Valley Note prior to trial.  He had determined that only Mr. Demodica could not be eliminated as the author of the Note....** [The remainder of this claim has been denied as procedurally defaulted or was not properly addressed by the respondent].

To the extent Harris claims his attorneys failed to request funds for a handwriting expert, this claim fails on its face.  While counsel may not have requested funds, they nevertheless consulted James Kelly, a special agent with the Georgia Bureau of Investigation.

The Tennessee Court of Criminal Appeals addressed this issue in post-conviction proceedings:

> With respect to counsel's investigation of the Maggie Valley letter, we initially note that the appellant was afforded, at the trial level, the opportunity to exonerate himself as the author of the Maggie Valley letter, which opportunity he rejected. Indeed, the Tennessee Supreme Court, on direct appeal, observed:
>
> > It is clear from the record that from at least late February 1988, three months before trial, the defendant knew that the State was seeking handwriting samples and was consulting an expert. The Defendant was aware of ... the significance of the handwriting issue. When the court ordered additional samples, the Defendant refused to comply.
>
> Thus, the appellant cannot now attribute to counsel's performance a situation which he, himself, created.

*Harris v. State*, 947 S.W.2d at 165 (quoting *State v. Harris*, 839 S.W.2d at 67) (citations omitted).

The appellate court then determined that Harris' attorneys did not render ineffective assistance of counsel.

> Moreover, the record reveals that counsel's investigation was constitutionally adequate. Prior to trial in this case, defense counsel contacted a handwriting expert, James Kelly, an agent with the Georgia Bureau of Investigation, and filed a motion for a certificate of need for Kelly. However, the information that they obtained from Kelly was ultimately no more conclusive than the opinion of the State's expert, Thomas Vastrick, a document examiner with the United States Postal Service. The record reflects that defense counsel reviewed Vastrick's reports, and that Goddard interviewed Vastrick on at least one occasion. With respect to Vastrick's opinion, Sexton testified that defense counsel "felt very comfortable in what Mr. Vastrick's position was. That he couldn't say that Mr. Harris was the author of that note." Faced with two inconclusive opinions, counsel could reasonably determine that the possibility of obtaining a favorable expert

opinion was outweighed by the risk that counsel would merely provide the State an adverse expert opinion.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments.

Defense counsel made a reasonable strategic decision to forgo further investigation and rely at trial upon the cross-examination of the State's expert witness.

> Unfortunately, defense counsel was informed only a few days prior to trial of another witness, Antonia Jones, who was familiar with the appellant's handwriting. When, on the first day of trial, defense counsel learned that both Antonia Jones and Vastrick were to testify, counsel requested an opportunity to have an independent expert examine the Maggie Valley letter and the appellant's handwriting. The trial court denied the request, holding that the request came too late. In any event, defense counsel vigorously cross-examined Jones. Moreover, counsel was able to locate and interview Jones' mother, Julia Jones. Mrs. Jones testified for the defense in an attempt to discredit her daughter's testimony. Based upon the foregoing, we cannot conclude that counsel's performance was deficient.

*Id*. at 165 (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

The findings of the appellate court are supported in the record. Mr. Sexton testified

during the post-conviction hearing that he and Mr. Goddard were comfortable with Mr.

Vastrick's position [Addendum 12, Transcript of the Evidence, vol.1, p. 83] and that Mr.

Kelly's conclusions were consistent with those of Mr. Vastrick [*Id.*, vol. 2, p. 132]. Mr. Sexton thus did not believe Mr. Kelly's testimony would be useful to the defense. [*Id.*].

This court concludes that the state court's determination that Harris' attorneys did not render ineffective assistance of counsel, with respect to obtaining a handwriting expert, was neither contrary to, nor did it involve an unreasonable application of, federal law as established by the U.S. Supreme Court in *Strickland v. Washington*. Accordingly, Harris is not entitled to habeas relief on this issue, and this claim of ineffective assistance of counsel will be denied.

> **p.      Counsel failed to file necessary motions before, during, and after trial, on direct appeal or on post-conviction.**

The court will consider this claim, to the extent Harris alleges his attorneys failed to move to suppress his statements to law enforcement. The Tennessee Supreme Court, on direct appeal, summarized Harris' statements as follows:

> On December 16, 1987, Harris was arrested in Atlanta, Georgia. He told a TBI agent that he had never been to Gatlinburg. In a series of contradictory and ambiguous statements given to TBI and Georgia law enforcement officers shortly after his arrest, he denied participating in the killings and implied that DeModica and Silvers were the murderers. He denied being in Knoxville with DeModica and Silvers. He denied meeting Tim. Subsequently, he denied going to Gatlinburg, unless, he added, Pelley said they had been there. He denied going to Maggie Valley and denied spending the night at the home of anyone named Tim. He stated that it was DeModica

who had a knife in the car and a pair of handcuffs. He later admitted being in Pigeon Forge.[25]

*State v. Harris*, 839 S.W.2d at 62.

The Tennessee Court of Criminal Appeals considered this issue in post-conviction proceedings:

> [T]he appellant complains that counsel did not attempt to suppress statements made by the appellant to law enforcement officers. However, the record reveals that the statements were not inculpatory, but rather exculpatory. The statements were general denials of participation in the killings and were in conformity with the appellant's position at trial that he was not present during the criminal episode. Counsel testified at the post-conviction hearing that, at the time of trial, he "didn't feel [that the statements] would become relevant ... but if they did, [h]e didn't mind ... the exculpat[ory] part getting in." The appellant has not demonstrated that this strategic decision of counsel was deficient performance.

*Harris v. State*, 947 S.W.2d at 167.

Again, the findings of the Tennessee Court of Criminal Appeals are supported in the record. When asked why he did not file a motion to suppress, Mr. Sexton testified as follows:

> To the best of my recollection, the only potential statements that Mr. Harris had given were the conversations that he had with Mr. Davenport, and whoever else was riding in his vehicle as they brought him back from Georgia to Sevier County. And then apparently there was some additional conversation later that day when they transported him somewhere else, and I can't remember now, why he went somewhere other than next door, but .. most of those conversations were just a very general, did not have anything of an

---

[25]The TBI agent was David Davenport. The court has reviewed Mr. Davenport's testimony at trial with respect to Harris' statements to him. [Addendum 2, Transcript of the Evidence, vol. XIII, p. 1072 - vol. XIV, p. 1115]. The Tennessee Supreme Court's summary is a fair representation of Mr. Davenport's testimony, although the court notes that Mr. Davenport also stated that Harris admitted to having been in Gatlinburg as well. [*Id*. at 1115].

incriminating nature, at least .. in our assessment, and in fact probably had some exculpating type statements included within them.

[Addendum 12, vol. 1, pp. 77-78].

This court thus concludes that the state court's determinations that Harris' attorneys did not render ineffective assistance of counsel, with respect to their failure to file a motion to suppress Harris' statements to law enforcement, was neither contrary to, nor did it involve an unreasonable application of, federal law as established by the U.S. Supreme Court in *Strickland v. Washington*. Accordingly, Harris is not entitled to habeas relief on this issue, and this claim of ineffective assistance of counsel will be denied.

q. **... Further, counsel was ineffective for failing to advise Petitioner regarding the consequences of his refusal to provide additional handwriting exemplars.** [The leading allegation of this claim has been denied as procedurally defaulted].

The trial court noted, in denying Harris' petition for post-conviction relief:

Counsel understood; petitioner understood; all and any would understand that additional writing samples could and perhaps would make a definitive rather than tentative judgement [sic] possible by the examiner. The refusal to provide exemplars was knowingly and understandingly determined as a matter of strategy, a calculated reduction of risk, for the defendant knew he wrote the note. Strategically, it was proper to refuse to make certain that which was uncertain.

[Addendum 11, Technical Record of Post-Conviction Proceedings, p. 256, 259, Judgment of Dismissal at 259-60]. The Tennessee Court of Criminal Appeals found as follows:

The appellant also claims that counsel failed to properly advise him of the consequences of his refusal to comply with the trial court's order to

provide additional handwriting exemplars. This issue, the appellant contends, is significant in view of the trial court's ruling that his refusal could be considered by the jury as an inference of guilt. However, the post-conviction court found that the appellant was advised of the consequences of his refusal "repeatedly, and intently." The record supports the finding of the post-conviction court. At the post-conviction hearing, Sexton was asked whether he recalled informing the appellant of the inferences that could be drawn at trial from the appellant's failure to submit additional samples. Trial counsel responded, "I believe we talked about it at the bench on the 11th. I believe that it was probably talked about at the hearing in Dandridge.... We talked with Mr. Harris about it. And I know it was brought up on this occasion. And I believe probably at one or two other occasions in the proceedings." This contention is without merit.

*Harris v. State*, 947 S.W.2d at 166.

The findings of the state courts are supported in the record. As noted by the appellate court, Mr. Sexton testified during the post-conviction hearings that he and Mr. Goddard discussed with Harris his refusal to provide additional samples and the consequences of that refusal. [Addendum 12, Transcript of the Evidence, vol. 1, pp. 59-60, 69].

Based upon the foregoing, this court concludes that the state courts' determinations that Harris' attorneys did not render ineffective assistance of counsel, with respect to their alleged failure to advise Harris of the consequences of his refusal to provide additional handwriting samples, was neither contrary to, nor did it involve an unreasonable application of, federal law as established by the U.S. Supreme Court in *Strickland v. Washington*. Accordingly, Harris is not entitled to habeas relief on this issue, and this claim of ineffective assistance of counsel will be denied.

**81.     Either before petitioner's trial, during the guilt/innocence phase or penalty phase of his trial, or during post trial or post-conviction**

proceedings, the Court committed errors that violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendment to the United States Constitution. These unconstitutional errors include but are not limited to the following:

  a.    The trial court failed and/or refused to grant a change of venue notwithstanding intense pre-trial publicity containing inadmissible and false information *and* failed and/or refused to allow Petitioner a full and fair opportunity to develop the factual basis for this claim.

The Tennessee Supreme Court considered and rejected this claim on direct appeal:

Defendant first asserts that the trial court erred in failing to grant a change of venue. A defendant may seek to change venue if it appears that a fair trial probably could not be had due to undue excitement against the defendant in the county where the offense occurred. Tenn.R.Crim.P., Rule 21(a). The question lies in the sound discretion of the trial court, whose decision must be respected absent a clear abuse of discretion. The Defendant avers that the trial court's refusal to grant him a change of venue was a clear abuse of the judge's discretion as required by Rule 21(a).

After a lengthy pretrial hearing on the motion to change venue, the trial court reserved making any judgment and took the motion under advisement, stating that he would attempt to select a jury panel before making any further ruling on the change of venue motion.

At the time of the crime (September 1986) and at the time of the arrest and pretrial proceedings involving the Defendant and the other co-defendants, there was extensive publicity. Most of the prospective jurors had heard or read something about the "Rocky Top Murders" when the killings occurred, but their exposure was not excessive. The record demonstrates that the trial court seated only jurors who had no or limited pretrial exposure to the case or who said they could disregard pretrial information and return a verdict based exclusively upon the evidence. The record discloses no undue excitement or any other reason why a change of venue would be required pursuant to Tenn.R.Crim.P. 21 or under the standards of *State v. Hoover*, 594 S.W.2d 743 (Tenn.Crim.App.1979). The Defendant has failed to demonstrate that the trial court abused its discretion in refusing to change venue.

The Defendant further argues that if the circumstances justified a change of venue for co-defendant Kimberly Pelley, then he was also entitled to a change of venue. Three weeks after the completion of the Harris trial, the trial court granted the motion for change of venue for Kimberly Pelley. The circumstances had in fact changed in that the Harris case itself had received extensive publicity. The trial court determined, because of the substantial trial publicity and because of the verdict in this case being reported, that Pelley could not get a fair trial in Sevier County. We find that the trial court did not abuse its discretion in refusing to change venue and that this issue is without merit.

*State v. Harris*, 839 S.W.2d at 63-64 (internal citations omitted).

The U.S. Supreme Court has noted that "[w]idespread bias in the community can make a change of venue constitutionally required." *McClesky v. Kemp*, 481 U.S. 279, 310 (1987) (citing *Irvin v. Dowd*, 366 U.S. 717 (1961)). In *Irwin*, the Court discussed the right of a criminally accused defendant to a fair trial, which includes a panel of impartial jurors. *Id*. at 722. Nevertheless, the Court noted the following:

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id*. at 722-23 (citations omitted).

The court has reviewed of the transcript of the jury selection in Harris' trial. [Addendum 2, Transcript of the Evidence, vol. IV, p. 107 - vol. IX, p. 607]. After a panel

was selected based upon general questions, the court conducted individual voir dire in chambers with respect to the jurors' knowledge of publicity concerning the case. [*Id*., vol. V, p. 272 - VI, p. 339; vol. VII, pp. 422-440, 452-468, 479 - VIII, p. 510; VIII, pp. 517-522, 524-566]. During the initial individual voir dire, the State observed that most of the jurors had forgotten what, if anything, they had heard or read, and the court noted: "The Court's not troubled about the impartiality of the jurors. They are much more astute than we tend to give them credit. They recognize the nature of the different distinctions ... differentiations between the media and the trial Courts. And they honor that. They will honor it." [*Id*., vol. VI, p. 339].

The transcript of the jury selection comports with the trial court's conclusion. The conclusions of the trial court, and of the Tennessee Supreme Court, are supported in the record. This court concludes that the state court's determinations that the trial court did not err in failing to grant a change of venue was neither contrary to, nor did it involve an unreasonable application of, federal law as established by the U.S. Supreme Court in *Irvin v. Down*. Accordingly, Harris is not entitled to habeas relief on this issue, and this claims will be denied.

> c.   **The trial court failed and/or refused to allow Petitioner funds to investigate and discover facts to rebut the State's case. Further, the trial court failed and/or refused to allow Petitioner funds for experts to rebut opinion testimony introduced by the State.**

These issues were raised on direct appeal. The Tennessee Supreme Court framed the issues as follows:

> The Defendant avers that the trial court erred in refusing to order the State to pay the expenses of an independent handwriting expert. He further complains that the trial court erred in refusing to require the presence of the FBI laboratory technician who tested samples of hair found at the scene of the murders.

> A key piece of evidence in this case was the "Maggie Valley letter." On the first day of trial, there occurred an in-chambers discussion of the various legal problems raised by the need for testimony concerning the handwriting in the Maggie Valley letter. Upon hearing that the State was prepared to offer the testimony of Antonia Jones and Thomas Vastrick, an expert in questioned documents, the Defendant requested an opportunity to have an independent expert examine the letter and the Defendant's handwriting. The court denied the request because it came too late.

*State v. Harris*, 839 S.W.2d at 67.

The Tennessee Supreme Court considered Harris' claim for a handwriting expert in light of *Ake v. Oklahoma*, 470 U.S. 68 (1985), in which the U.S. Supreme Court held:

> [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Id*. at 83. The federal courts have construed *Ake* generally to require the State to provide an indigent defendant with any expert services that are necessary to present an adequate defense. *See*, *e.g., Terry v. Rees*, 985 F.2d 283, 284 (6th Cir. 1993) (defendant improperly denied an independent pathologist).

The Tennessee Supreme Court then found as follows:

It is clear from the record that from at least late February 1988, three months before trial, the defendant knew that the State was seeking handwriting samples and was consulting an expert. The Defendant was aware of Vastrick's testimony and the significance of the handwriting issue. When the court ordered additional samples, the Defendant refused to comply. The trial court allowed the Defendant to send copies of the Maggie Valley letter and Silvers' handwriting to James Kelly, a handwriting expert with the Georgia Bureau of Investigation. The court did not foreclose granting expenses for Kelly to testify. Neither the State nor the court ever led the Defendant to believe that Vastrick would not testify. Other than the request for Kelly to testify and to examine his co-defendant's handwriting, the record does not show that the Defendant ever made a specific request for an independent handwriting analysis before trial began. Under these circumstances, the trial court did not abuse its discretion.

*State v. Harris*, 839 S.W.2d at 67.

This court has reviewed the pretrial motions argued in this case. [Addendum 2, vol. I, pp. 1-100; vol. II, pp. 101-217]. The conclusions of the Tennessee Supreme Court are supported in the record. This court concludes that the state court's determination that the trial court did not err in failing to allow an independent handwriting expert was neither contrary to, nor did it involve an unreasonable application of, federal law as established by the U.S. Supreme Court in *Ake v. Oklahoma*. Accordingly, Harris is not entitled to habeas relief on this issue, and this claim will be denied.

With respect to Harris' claim that the presence of the FBI laboratory technician was required, the Tennessee Supreme Court disagreed:

At a pre-trial hearing on April 11, 1988, the Defendant requested that the author of the FBI hair and fiber report be subpoenaed to testify. The court granted the request pending a showing of relevancy and materiality of the testimony. When it appeared that problems were arising with scheduling the testimony of the FBI agent, the court, upon the State's agreement to stipulate to all the information contained in the report, ordered the parties to stipulate

the contents of the report. A defendant seeking to secure the presence of an out-of-state witness must demonstrate that the witness will offer material testimony. Since the necessary proof was developed by stipulation, the Defendant failed to meet his burden of showing materiality. Portions of the report were read into evidence at trial, and the jury was instructed to treat the stipulated information the same as if the agent had testified. Since the necessary, material and competent proof sought to be established by the witness (i.e., that a Negro hair was found on Valentine) was established by the stipulation, there is no reversible error in failing to subpoena the agent to testify in person.

*State v. Harris*, 839 S.W.2d at 67-68 (internal citations omitted).

The conclusions of the Tennessee Supreme Court are supported in the record. During a break in individual voir dire, the defense attorneys brought to the court's attention the difficulty in scheduling the testimony of F.B.I. Agent Malone. The State agreed to stipulate to the agent's report, and the court ordered the stipulation. [Addendum 2, Transcript of the Evidence, vol. V, pp. 292-94]. During trial, the stipulation was read into the record and the jury was instructed as follows:

This is, it's agreed that ... if this expert witness with the F.B.I. were called as a witness he would have testified to this ladies and gentlemen, a stipulation means agreement. If he were on the witness stand. You treat that as though he were on the witness stand. And gave this evidence. It's agreed and is stipulated he's an expert witness, a qualified witness and you may consider his opinion, the premises for his opinion, and these findings based on his examinations. You may treat that as evidence, and consider it as such.

[*Id.*, vol. XVI, pp. 1390-91].

Harris is not entitled to habeas relief on this issue, and this claim will be denied. *See, e.g., United States v. Moore*, 917 F.2d 215, 230-31 (6th Cir. 1990) (decision whether to issue a subpoena is within discretion of the trial court).

d. **The trial court violated Petitioner's rights by: ..., and by suggesting to the jury that Petitioner was required to testify.** [The leading allegations of this claim have been denied as procedurally defaulted].

This claim was considered and rejected by the Tennessee Supreme Court on direct appeal:

> Defendant also alleges that the trial court's opening remarks to the jury panel left an improper implication with the jury about the Defendant's failure to testify and the burden of proof. During his opening remarks to the jury panel before the beginning of voir dire, the court informed the prospective jurors that the Defendant might or might not testify, but that, if the State failed to prove its case, then the Defendant did not have to do anything. Defendant avers that these remarks compelled the Defendant to testify and unconstitutionally commented on the Defendant's right not to testify. In his remarks, the Court made it clear that the Defendant was presumed innocent and that his failure to testify could not be considered "for any purpose whatsoever." At no point did the court suggest that guilt could be inferred from Defendant's silence or that the burden of proof lay upon him. At the close of the guilt phase, the court correctly instructed the jury regarding the presumption of innocence and admonished the jury that the Defendant's failure to testify could not be considered as an admission of guilt. We find no reversible error.

*State v. Harris*, 839 S.W.2d at 66-67.

The conclusions of the Tennessee Supreme Court are supported in the record. The full text of the trial court's comments with respect to this issue, made to the potential jurors prior to voir dire as part of the court's opening statements to the jury, were as follows:

> ... That's why I've told you about the law, and taking this time to tell you about the law on a reasonable doubt, presumption of innocence. This defendant may testify on this charge. He may not. He is presumed innocent, after all. There is no evidence against him here whatsoever, after all. He is not required to make defense at all. If the State fails to satisfy you beyond a reasonable doubt and to a moral certainty, on their proof, he doesn't have to deny it. He doesn't

have to explain it. If they can't make the case, he's not required to do anything. He can rest on his plea of not guilty. He's here on a plea of not guilty. On the other hand, no matter what proof the State introduces or how much proof the State introduces, he's still here on a plea of not guilty. He's still presumed innocent, and you must be satisfied beyond a reasonable doubt. And he may offer testimony or he may not. If he decides not to offer testimony, you may not consider that for any purpose whatsoever. Understand that right now. He doesn't have to tell you anything. He doesn't have to tell me anything. And you may not consider his failure to testify for any purpose whatever. Because he's got the same rights you and I have got. If he testifies, listen to him. See what he has to say. If he doesn't testify, you may not consider, discuss it, or in *any* way let that enter into your judgment. And that's important. I'll ask you point blank if you'll hold it against him if he decides not to testify. I don't know whether he'll testify or not. That's up to him, up to his lawyers. And these are good lawyers. And this defendant will decide that with them themselves....

[Addendum 2, vol. III, p. 25-26].

In *Griffin v. California*, 380 U.S. 609 (1965), the Supreme Court held that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id.* at 615. In *Lakeside v. Oregon*, 435 U.S. 333 (1978), the Court further held that the trial judge's giving, over defendant's objection, a cautionary instruction that the jury should not draw any adverse inference from defendant's decision to not testify did "not violate the privilege against compulsory self-incrimination guaranteed by the Fifth and Fourteenth Amendments." *Id.* at 340-41.

In this case, the trial court stressed to the jury the fact that Harris was presumed innocent, that he was not required to testify, and that, if Harris chose not to testify, his failure to testify could not be held against him for any reason whatsoever. Thus, the state court's

determination that the trial court did not impermissibly suggest that Harris was required to testify was neither contrary to, nor did it involve an unreasonable application of, federal law as established by the U.S. Supreme Court in *Griffin v. California* and *Lakeside v. Oregon*. Accordingly, Harris is not entitled to habeas relief on this issue, and this claim will be denied.

> **e.** **The trial court violated the strictures of *Witherspoon* by excluding, *inter alia*, Jurors Reagan, Norton, Hampton, and Peerman.** ***See State v. Harris*, 839 S.W.2d 54, 85 (Tenn. 1992) (Reid, C.J. and Daughtry, J., dissenting) ("[I]n the specific instances complained of in this case, the [trial] court's ruling on this issue seemed based on an antipathy to rehabilitation in general and a desire to assure quick jury selection, rather than a consideration of the specific circumstances regarding each juror and the need to guarantee the constitutional rights of the defendant.").**

The Tennessee Supreme Court considered this issue on direct appeal:

> The Defendant next raises a series of challenges concerning the selection of jurors predicated upon the Sixth and Fourteenth Amendments of the U.S. Constitution. First, the assertion is made that the trial court erred by excusing for cause fourteen potential jurors who expressed concern about imposing death as a penalty, without providing the Defendant with an opportunity to rehabilitate each juror. The trial judge conducted all voir dire touching upon the juror's views concerning the death penalty and foreclosed any rehabilitation by the defense. Of the fourteen prospective jurors whose excusals are challenged, one, Tommy Walker, was excused with the consent of all the parties and the Defendant did not object. Another, Janet Regan [sic], was excused because she could not set aside her opinion about the case, and another, Elsie Hampton, because of her inability to be impartial since she herself was a motel desk clerk in the area of the murders and had read several news accounts about the case. The remaining eleven prospective jurors clearly and unequivocally stated in one form or another that they could not consider the death penalty as a potential punishment. All acknowledged that under no circumstances would they consider imposing the death penalty. A typical response expressed to the trial court was, "I couldn't vote for it. No way."

We find the trial court committed no error in the present case. The responses of the prospective jurors revealed that their views on the death penalty would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and their oaths. This met the standard of *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). We are also mindful that the trial court's finding on this issue is to be accorded a presumption of correctness inasmuch as such findings involve a determination of demeanor and credibility particularly within the trial court's province and that the burden rests on the Defendant to establish by convincing evidence that the court's determination was erroneous. The Defendant has failed to meet this burden. Moreover, the Defendant's failure to object to the dismissal of juror Walker waives appellate review as to this particular juror.

As to the rehabilitation question, we hold that there is no error in refusing to allow a Defendant to rehabilitate a prospective juror who has repeatedly and unequivocally indicated that he or she would automatically vote against the death penalty so that there is no leeway for rehabilitation.

*State v. Harris*, 839 S.W.2d at 64-65 (internal citations omitted).

In *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the U.S. Supreme Court invalidated

an Illinois state law that allowed prosecutors to challenge for cause any prospective juror

who expressed reservations about capital punishment. In doing so, the Court held that a juror

cannot be excused for cause based upon a general objection to the death penalty, but only if

he states unambiguously that he would automatically vote against the death penalty, no

matter what the facts of the case were. *Id.* at 520-23.

The Supreme Court clarified the *Witherspoon* decision, in *Wainwright v. Witt*, 469

U.S. 412 (1985), and announced the proper standard for determining when a prospective

juror may be excused for cause based upon his views of capital punishment: "That standard

is whether the juror's views would 'prevent or substantially impair the performance of his

duties as a juror in accordance with his instructions and his oath.'" *Id*. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).

In this case, Ms. Reagan was excused because she stated she had a strong enough opinion of the case, based upon what she had heard, that she could not set her feelings aside. [Addendum 2, Transcript of the Evidence, vol. IV, pp. 117-120]. Ms. Hampton was excused because she worked as a motel desk clerk and did not believe she could be a fair and impartial juror. [*Id*., vol. V, pp. 267-68]. Thus, neither of these jurors was excused because of her feelings about the death penalty.

Mr. Norton stated he had a problem with the death penalty and did not believe in taking someone's life under any circumstances, and thus was excused. [*Id*., vol. IV, pp. 185-186]. At first, Ms. Peerman did not raise any objection to sitting as a juror in Harris' case. [*Id*., vol. VII, pp. 403-407]. Upon reflection, however, she subsequently met with the trial judge in chambers and voiced her feelings as to the amount of evidence, without question, that she would require in order to impose the death penalty. [*Id*. at 476-78]. As a result, the trial court excused Ms. Peerman. [*Id*., vol. VIII, p. 522].

Based upon the foregoing, the conclusions of the Tennessee Supreme Court are supported in the record. This court concludes that the state court's determination that the trial court did not err in excluding certain jurors was neither contrary to, nor did it involve an unreasonable application of, federal law as established by the U.S. Supreme Court in *Wainwright* and *Adams*. Accordingly, Harris is not entitled to habeas relief on this issue, and this claim will be denied.

g. **The trial court violated Petitioner's rights in limiting the defense in cross-examination and presentation of proof by: limiting cross-examination of two key prosecution witnesses in front of the jury; and refusing to introduce Doby/Silver's statement when he exercised his Fifth Amendment rights and declined to testify.**

The court assumes Harris is referring to prosecution witnesses Tim Farmer and Joe DeModica, since he raised this claim with respect to them on direct appeal. The Tennessee Supreme Court rejected the claim, finding as follows:

> The Defendant next asserts that the trial court erred in limiting his cross-examination of Farmer and DeModica. The propriety, scope, manner and control of examination of witnesses is within the trial court's discretion and will not be interfered with in the absence of an abuse of discretion. The trial court restricted questions which were repetitious and argumentative. The record reflects that the trial court did not prohibit the Defendant from cross-examining Farmer or DeModica regarding any relevant material.

*State v. Harris*, 839 S.W.2d at 72 (citations omitted).

In *Alford v. United States*, 282 U.S. 687, 691 (1931), the U.S. Supreme Court noted that "[c]ross-examination of a witness is a matter of right." The Court further observed:

> Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply. It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what fact a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them.

*Id*. at 692 (citations omitted). The Court also noted, however, that "[t]he extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court. It may exercise a reasonable judgment in determining when the subject is exhausted." *Id*. at 694 (citations omitted).

The court has reviewed, *inter alia*, the cross-examination of Joseph DeModica, [Addendum 2, vol. XI, p. 837 - vol. XII, p. 931], and finds that Harris' counsel was not restricted in cross-examination as to relevant material. Harris alleged on direct appeal that the trial court restricted his right to cross-examine DeModica with respect to the contradictions between his previous sworn statements and his trial testimony. DeModica admitted, however, on cross-examination, that the first statement he gave authorities was not truthful, [*id*., vol. XII, p. 910], and he was questioned as to prior statements [*id*. at 914-18]. In addition, he admitted telling Mr. Jim Boone, the polygraph examiner, that he had no direct knowledge of the homicides and that Harris was not in Gatlinburg on the date of the homicides. [*Id*. at 921]. DeModica was also questioned as to his extensive criminal record. [*Id*. at 928-31].

The court has also reviewed, *inter alia*, the cross-examination of Tim Farmer, [Addendum 2, vol. XIII, pp. 1018-1035], and finds that Harris' counsel was not restricted in cross-examination as to relevant material. Harris alleged on direct appeal that he was limited in his ability explore the inconsistencies between Farmer's trial testimony and his previous statements. Farmer was, however, questioned about the statements he had given to law

enforcement officers, some of which he recalled and others he did not recall. [*Id*. at 1027-33].

Based upon the foregoing, the conclusions of the Tennessee Supreme Court are supported in the record. The state court's determination that the trial court did not improperly limit cross-examination was neither contrary to, nor did it involve an unreasonable application of, federal law as established by the U.S. Supreme Court in *Alford*. Accordingly, Harris is not entitled to habeas relief on this issue, and this claim will be denied.

Regarding Harris' claim that his rights were violated when the trial court refused to introduce Doby/Silvers' statement, a similar claim was raised on direct appeal. Harris subpoenaed Doby/Silvers. At the conclusion of the State's evidence, and out of the presence of the jury, Doby/Silvers' attorney moved to quash the subpoena, asserting his client's Fifth Amendment right not to testify; the trial court granted the motion to quash. [Addendum 2, Transcript of the Evidence, vol. XV, pp. 1234-35]. Harris argued that Doby/Silvers should have been required to take the witness stand and assert his Fifth Amendment right in the presence of the jury, but the trial court refused to do so. [*Id*. at 1236]. Harris' counsel then stated: "Your Honor because of that motion we would ask that *for the record only*, that we be allowed to file all the statements that Mr. Doby has made in reference to this case?" [*Id*. (emphasis added)]. The court denied the request. [*Id*. at 1237]. It is important to note that counsel did not ask that the jury be allowed to consider the statements of Doby/Silvers.

The Tennessee Supreme Court found no error in the trial court's refusal to require Doby/Silvers to take the stand. "It is not error to refuse to force a witness to take the stand to claim his Fifth Amendment privilege in front of a jury, nor may a jury draw inferences

from the decision of a witness to exercise his constitutional privilege against self-incrimination." *State v. Harris*, 839 S.W.2d at 72 (citation omitted). This finding was in line with federal court decisions. *See, e.g., United States v. Vandetti*, 623 F.2d 1144, 1147 (6th Cir. 1980) (it is within the trial court's discretion whether to allow counsel to call a witness who will claim his privilege against self-incrimination and not testify); *United States v. LaCouture*, 495 F.2d 1237, 1240 (5th Cir. 1974) ("Neither side has the right to benefit from any inferences the jury may draw from the witness' assertion of the privilege alone or in conjunction with questions that have been put to him.").

In his brief on direct appeal, Harris alleged that the court erred in not allowing him to introduce the statements of Doby/Silvers, because they were inconsistent with the testimony of Joseph DeModica. [Addendum 4, Brief of the Defendant, p. 199]. The Tennessee Supreme Court did not address that claim. The court notes, however, in his motion for new trial, Harris alleged, *inter alia*, the following: "That the Court erred in disallowing the Defendant to introduce *for the record* the Statements of Rufus Edward Doby which contained many inconsistences [sic] from the testimony given by Joseph Demodica." [Addendum 1, Technical Record of direct appeal, Motion for New Trial, p. 79, 89 ¶50 (emphasis added)]. Again, Harris' counsel was not alleging that the jury should have been allowed to consider the statements of Doby/Silvers.

The court subsequent to trial allowed all statements, including those of Doby/Silvers, to be filed as part of the record. [Addendum 2, vol. XIX, p. 1602, Collective Exhibit 50, Statements of Doby (Ashley Silvers)]. For that reason, at the hearing on the motion for new

trial, Harris' counsel noted that alleged error number 50 could be stricken, since the statements had been introduced into the record. [*Id.*, vol. XX, p. 111].[26]

Thus, any claim that the statements of Doby/Silvers were not made a part of the record is without merit. To the extent Harris claims the statements should have been introduced into evidence for consideration by the jury is procedurally defaulted. This claim will be denied.

> **j.** **The trial court violated Petitioner's rights by failing to personally inform him of the consequences of refusing to submit additional handwriting exemplars and failing to determine whether Petitioner, in fact, had knowingly and intelligently refused to submit additional handwriting exemplars. This error was particularly egregious because the trial court admitted evidence of Petitioner's refusal to provide additional exemplars and then charged the jury with an adverse inferences instruction in violation of Petitioner's right against self-incrimination. *See State v. Harris*, 839 S.W.2D 54, 78-80 (Tenn. 1992) (Reid, C.J. and Daughtrey, J. dissenting).**

This issue was considered and rejected by the Tennessee Supreme Court on direct appeal:

> The Defendant avers that the trial court erred in allowing evidence of his refusal to supply additional handwriting exemplars and in allowing the jury to draw an adverse inference from the refusal. The proof shows that, after giving some handwriting samples, in defiance of a court order, the Defendant refused to give additional samples when Vastrick requested more examples of

---

[26]The court has reviewed the statements of Doby/Silvers. While they do contain inconsistencies with DeModica's testimony, the statements are certainly not exculpatory for Harris, but rather extremely inculpatory. It would thus be surprising had counsel wanted the jury to consider the statements.

lower-case letters written by the Defendant. Evidence of this refusal came before the jury and the court charged the jury as follows:

> "Evidence that Court-ordered additional handwriting samples, were not provided as ordered, may raise an inference, that the additional samples if provided would prove adverse to him. Whether the inference is drawn, is for your judgment. And what value it may have is likewise for your judgment. You will look to any explanation given or any explanation apparent in the proof, which otherwise explains the refusal, which would make an inference inappropriate. Whether an inference should be drawn, and what value if any it may have is for your judgment."

The Defendant argues that use of this evidence violates his Fifth Amendment right against self-incrimination. That right, however, is not violated by requiring a defendant to provide handwriting samples for comparison with other evidence, nor does the introduction of evidence that a defendant refused to take a legally required test violate the right against self-incrimination. Contrary to the Defendant's argument, the failure to warn the Defendant that his refusal could be used against him at trial does not violate the Due Process Clause. The Defendant asserts that use of the evidence violates his Sixth Amendment right to counsel, but the record shows that his attorney was present when he was asked to give samples. Any indication by an accused of a desire to evade prosecution may be shown as one of a series of circumstances from which guilt may be inferred.

The Defendant also challenges as unconstitutional the court's charge regarding the inference to be drawn from his refusal to give handwriting samples. The Defendant says that the instruction shifted the burden of proof contrary to the rule of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). There is no merit to this argument because the instruction, which clearly charged the jury that any inference was permissive and rebuttable, did not relieve the State of proving an element of the offense in violation of Sandstrom.

*State v. Harris*, 839 S.W.2d at 70-71.

In *South Dakota v. Neville*, 459 U.S. 553 (1983), the U.S. Supreme Court held that

South Dakota's implied consent law, which allowed evidence of a suspected drunk driver's

refusal to take a blood-alcohol test to be used against him at trial, did not violate the Fifth Amendment privilege against self-incrimination. *Id*. at 564. The Court also held that the defendant's due process rights were not violated, even though he was not warned that his refusal to take the blood-alcohol test could be used against him at trial. *Id*. at 566.

The conclusions of the Tennessee Supreme Court, that Harris' Fifth Amendment right against self-incrimination was not violated, was neither contrary to, nor did it involve an unreasonable application of, federal law as established by the U.S. Supreme Court in *South Dakota v. Neville*. Accordingly, Harris is not entitled to habeas relief on this issue, and this claim will be denied.

> **n.** **The trial court violated Petitioner's rights by denying Mr. Harris' motion for judgment of acquittal at the close of the State's case. The State failed to introduce evidence sufficient to sustain Petitioner's conviction under state law. There was no evidence corroborating the testimony of Mr. Harris' co-defendant, Joseph Demodica. Under Tennessee law Mr. Demodica's testimony could only be considered if it were corroborated by independent evidence sufficient to establish Mr. Harris' identity** *as one of the perpetrators of the offense.* **No such evidence was introduced. In the absence of Mr. Demodica's testimony, there was no evidence placing Mr. Harris at the scene of the crime.**

This claim was raised on direct appeal as a challenge to the sufficiency of the evidence to support the conviction. The court will consider this claim together with the claim set forth in section 84, infra, concerning the sufficiency of the evidence. To the extent Harris alleges his conviction failed to comport with Tennessee state law, his claim "is not cognizable in a

federal habeas corpus proceeding." *Spalla v. Foltz*, 788 F.2d 400, 405 (6th Cir. 1986). *See also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions"); *Lewis v. Jeffers*, 497 U.S. 764, 779 (1990) ("federal habeas corpus relief does not lie for errors of state law"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."); *Sinistaj v. Burt*, 66 F.3d 804, 807 (6th Cir. 1995) ("Errors of state law alone cannot form the basis of relief under federal habeas corpus."); *Houston v. Dutton*, 50 F.3d 381, 385 (6th Cir. 1995) ("When and how state law applies to a particular case is a matter on which the state supreme court has the last word. No federal issues are implicated and no federal question is presented in determining whether a change in state law is to be applied retroactively.") (citation omitted).

> **t.    The Court improperly refused to provide Petitioner with investigators, psychological experts, and/or any other experts, even though the same were absolutely necessary in order for Mr. Harris to meet the pleading and proof requirements of Tennessee's post-conviction statutes.**

This claim was presented to Tennessee Court of Criminal Appeals on appeal from the denial of post-conviction relief. Allegations of error in post-conviction proceedings, however, cannot afford federal habeas corpus relief.

> Section 2254 only authorizes federal courts to review the constitutionality of a state criminal conviction, not infirmities in a state post-conviction relief proceeding. Because there is no federal constitutional requirement that states provide a means of post-conviction review of state convictions, an infirmity

in a state post-conviction proceeding does not raise a constitutional issue cognizable in a federal habeas petition.

*Williams-Bey v. Trickey*, 894 F.2d 314, 317 (8th Cir. 1990) (citations omitted). *See also*

*Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986); *Williams v. State of Missouri*, 640 F.2d

140, 143 (8th Cir. 1981). This claim will be denied.

> **84. The evidence adduced at Petitioner's trial on guilt or innocence, when viewed in the light most favorable to the prosecution, was insufficient to allow a rational trier of fact to find Petitioner guilty of first degree murder beyond a reasonable doubt. No evidence was presented to establish the statutorily-required corroboration of the testimony of co-defendant Demodica. The finding of the trial court and the Tennessee Supreme Court that such corroboration was presented was not fairly supported by the record. Further, the trial court and the Tennessee Supreme Court violated Petitioner's rights to equal protection under the Fourteenth Amendment by their arbitrary and capricious application of, and/or departure from, state law regarding the corroboration requirement. Without Mr. Demodica's testimony there was no evidence upon which any reasonable trier of fact could have convicted Mr. Harris. Petitioner's conviction for first degree murder and his sentence of death violate the Eighth and Fourteenth Amendments to the United States Constitution.**

The Tennessee Supreme Court considered this claim on direct appeal:

> The Defendant next asserts that the evidence was insufficient to support his conviction. It is well established that a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State. On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. Moreover, a verdict against the Defendant removes the presumption of innocence and raises the presumption of guilt on appeal, which the Defendant has the burden of overcoming. Where the sufficiency of the convicting evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most

favorable to the State, any rational trier of fact could have found Defendant guilty beyond a reasonable doubt.

Joseph DeModica testified that the Defendant and Pelley took Melissa Hill into the motel room where her body was subsequently discovered. The Defendant and Pelley fought with Troy Valentine, clubbed him unconscious and dragged him into the room. DeModica heard two gunshots inside the room. He testified that when the Defendant and Pelley came out of the motel room they looked as though someone had sprayed them with red paint. The massive amount of blood and the number of injuries inflicted upon each victim corroborated this statement. DeModica knew that Valentine had been clubbed with his flashlight. This information was not released to the media and would have been known only to the killers.

Substantial evidence corroborated DeModica's testimony that the Defendant was implicated in this crime. Each victim suffered a deep neck wound from a serrated knife. Each victim had been shot in the head. Tim Farmer testified that the Defendant carried a lock-blade knife and a hunting knife with a serrated edge. Further, on the day of the murders, Defendant and his companions left for Gatlinburg with no money.

Following his arrest, the Defendant first denied going to Gatlinburg or going to Knoxville with DeModica and Silvers. He subsequently stated that he and his companions had eaten in a restaurant in Pigeon Forge and that he had purchased a chain for Pelley while they were in Gatlinburg with DeModica and Silvers.

The Maggie Valley letter, which was found three days after the murders, contained information which only the killers would have known. Expert testimony excluded Pelley, DeModica and Silvers as the authors of the letter. Expert testimony further established strong indications that the Defendant wrote this letter. Antonia Jones, who was familiar with the Defendant's handwriting and writing ability, identified the Defendant's handwriting on the Maggie Valley letter.

*State v. Harris*, 839 S.W.2d at 75-76 (internal citations omitted). The state supreme court then affirmed Harris' judgment of conviction, concluding that "the overwhelming evidence supported the verdict of the jury." *Id.* at 76.

In a federal habeas corpus proceeding in which a state prisoner challenges the sufficiency of the evidence supporting his conviction, the petitioner "is entitled to a determination whether the record evidence could support a finding of guilt beyond a reasonable doubt." *Moore v. Duckworth*, 443 U.S. 713, 714 (1979). The petitioner is entitled to habeas relief, however, only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). *See Brofford v. Marshall*, 751 F.2d 845, 856 (6th Cir. 1985).

When reviewing a jury's verdict under a sufficiency of the evidence standard, a court must consider all the evidence in a light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. at 319. Witness credibility is an issue to be left solely within the province of the jury, *Deel v. Jago*, 967 F.2d 1079, 1086 (6th Cir. 1992); *United States v. Schultz*, 855 F.2d 1217, 1221 (6th Cir. 1988), and substantial deference should be given to the trier of fact. *United States v. Ayotte*, 741 F.2d 865, 867 (6th Cir. 1984). "[T]he federal court sitting in habeas should not attempt to substitute its own opinion for that of the jury which convicted the petitioner." *York v. Tate*, 858 F.2d 322, 329 (6th Cir. 1988). A conviction should be affirmed if *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Bourjaily*, 781 F.2d 539, 544 (6th Cir. 1986), *aff'd*, 483 U.S. 171 (1987).

As noted previously in this opinion, the court has reviewed the entire record of Harris' trial. There was sufficient evidence under the standard established in *Jackson* to support

Harris' conviction. Accordingly, the conclusion of the Tennessee Supreme Court was neither contrary to, nor did it involve an unreasonable application of, federal law. Harris is not entitled to habeas relief on this issue. Likewise, the trial court did not err in denying Harris' motion for judgment of acquittal. These claims will be denied.

> **90. Both Petitioner and Petitioner's former post-conviction counsel were denied the ability to fully develop all claims for relief due to the unavailability of funds for expert assistance in the nature of expert witnesses, investigators, etc. Further, Petitioner was denied a reasonable amount of time to develop the facts supporting his claims for relief. The unavailability of both time and funds for these purposes is attributable to state law, practice and/or custom and such law, practice and/or custom results in the violation of Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Moreover, because of such state action, the procedures afforded Petitioner at the time of trial, direct appeal, and/or state post-conviction proceeding, were neither full, nor fair, nor otherwise sufficient to preclude federal review under, *inter alia*, *Townsend v. Sain*, 372 U.S. 293, 318 (1963).**

This claim related to Harris' post-conviction proceedings. As noted earlier, allegations of error in post-conviction proceedings cannot afford federal habeas corpus relief, and this claim will be denied.

V.  Remaining Grounds for Relief

For the reasons set forth below, the respondent is **DIRECTED** to file an answer or other response to the following enumerated claims:

**79.** Petitioner was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the prosecution withheld credible exculpatory evidence, including evidence demonstrating, *inter alia*, that credible disinterested witnesses were available to substantially impeach the testimony of Joseph Demodica and that credible witnesses and other evidence were available to demonstrate that the subject robbery and murders were committed by persons other than the defendant. The evidence was highly exculpatory to both the jury's determination of petitioner's guilt and its consideration of the proper sentence. There is a reasonable probability that had the evidence not been withheld Mr. Harris' jury would not have convicted him and would not have sentenced him to death. The prosecution withheld the following exculpatory evidence, material to both the guilt and sentencing phase of trial: [Subparts a-k, setting forth the alleged exculpatory evidence, omitted].

In response to Harris' original habeas corpus petition, the respondent filed a 371-page answer, which included argument for why respondent was entitled to summary judgment on various claims. The court granted Harris' motion to strike the answer and directed the respondent to separate his answer from his motion for summary judgment; the court noted that respondent would not be required to file his answer until after the court ruled upon the motion for summary judgment. The respondent thereafter filed a motion for partial summary judgment.

Harris subsequently filed an amended petition for the writ of habeas corpus, and the respondent filed an amended motion for summary judgment. Because Harris' *Brady*[27] claim

---

[27]*Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("We now hold that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

was subject to ongoing discovery, the preceding ground for relief was not addressed in the motion for partial summary judgment nor in the amended motion for summary judgment.

**80.    In violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, Petitioner was denied the effective assistance of counsel at the guilt phase of trial, the sentencing phase of trial, on appeal, and in post-conviction proceedings.  In particular counsel failed to perform reasonably, and there is a reasonable probability, sufficient to undermine confidence in the outcome of trial, sentencing, appeal, and post-conviction proceedings, that, had counsel performed reasonably, Petitioner would not have been convicted or sentenced to death, and/or would have received relief on appeal or in post-conviction proceedings.  Specifically, counsel was ineffective for the following non-exclusive list of reasons:**

> **g.    ....  Counsel failed to obtain a crime scene reconstruction expert to testify that the conclusions reached by Dr. Blake were not consistent with the physical evidence, that such conclusions were not within the knowledge of Dr. Blake's area of expertise, and that such conclusions were not within the knowledge of a lay witness. ...** [Omitted allegations have been addressed elsewhere in this opinion].

Respondent contends that the preceding subpart of section 80 was procedurally defaulted.  The claim was raised, however, in Harris' petition for post-conviction relief [Addendum 11, pp. 1-18, Petition for Post Conviction Relief, § 12, subpart b.(iii) at 6], and was pursued on appeal from the denial of post-conviction relief [Addendum 13, Brief of Appellant, p. 31].

**86.    The jury instructions in this case at the guilt phase violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  These unconstitutional jury instructions include, but are not limited to, the following:**

      a.      **Definitions of premeditation, the presumption of innocence, and other terms or phrases which were inaccurate, incomplete, confusing, inadequately defined or tended to mislead the jury. E.g., Tr. 1440, 1444.**

      d.      **Instructions which informed the jurors that deliberation could be formed in an instant. Tr. 1442.**

      e.      **Instructions that the jury could consider lesser included offenses *only* if it had decided that Petitioner was not guilty of the charged offenses.**

Respondent contends the preceding subparts of section 86 were procedurally defaulted. Respondent concedes that these or substantially similar claims were raised in Harris' petition for post-conviction relief and on appeal to the Court of Criminal Appeals, but claims they were abandoned by Harris' failure to include them in his application for permission to appeal to the Tennessee Supreme Court and thus were defaulted. In the past, the required state court review for complete exhaustion included review by the Tennessee Supreme Court. *Picard v. Connor*, 404 U.S. 270 (1971). On June 28, 2001, however, the Tennessee Supreme Court promulgated Rule 39, which provides in pertinent part:

> In all appeals from criminal convictions or post-conviction relief matters from and after July 1, 1967, a litigant shall not be required to petition for rehearing or to file an application for permission to appeal to the Supreme Court of Tennessee following an adverse decision of the Court of Criminal Appeals in order to be deemed to have exhausted all available state remedies respecting a claim of error. Rather, when the claim has been presented to the Court of Criminal Appeals or the Supreme Court, and relief has been denied, the litigant shall be deemed to have exhausted all available state remedies available for that claim.

Tenn. Sup. Ct. R. 39.

In *Adams v. Holland*, 330 F.3d 398 (6th Cir. 2003), *cert. denied*, 541 U.S. 956 (2004), the Sixth Circuit held "that Rule 39 rendered Tennessee Supreme Court review 'unavailable' in the context of habeas relief."  The court also held that Rule 39 was not a change in Tennessee law, but only a clarification of existing law, and thus it should be applied retroactively so as to prevent procedural default.  Accordingly, Harris has not procedurally defaulted the preceding subparts of section 86.

VI.   Conclusion

The respondent's motion for summary judgment will be **GRANTED** to the extent set forth in this Memorandum.  The petitioner's claims which are moot, as identified by the court herein, will be **DENIED** as **MOOT**.  The petitioner's claims which are procedurally defaulted, as identified by the court herein, will be **DENIED** on the basis of procedural default.  The petitioner's claims which were considered on the merits by the state courts, as identified by the court herein, will be **DENIED**.  The respondent will be **ORDERED** to file his answer or other response with respect to the remaining claims.

**AN APPROPRIATE ORDER WILL ENTER.**

_____s/ Leon Jordan_____
United States District Judge