UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at KNOXVILLE

| | | |
|---|---|---|
| EDWARD L. HARRIS | ) | |
| | ) | |
|    *Petitioner*, | ) | |
| | ) | |
| v. | ) | No. 3:97-cv-407 |
| | ) | *Jordan* |
| | ) | |
| RICKY BELL, Warden | ) | |
| | ) | |
|    *Respondent*. | ) | |

## **MEMORANDUM OPINION**

This is a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Edward L. Harris ("Harris"). The court previously granted the respondent's motion for summary judgment and denied a majority of Harris' claims for habeas relief; reference is made to that opinion for the procedural history and factual background of this case. The court then ordered the respondent to file his answer or other response with respect to the remaining claims for relief, which were not addressed on the merits in the motion for summary judgment. Reference is also made to the court's prior opinion for the applicable standards of review in habeas proceedings.

For the following reasons, Harris' remaining claims for relief will be **DENIED**. The court will refer to Harris' claims as set forth in his amended habeas corpus petition by their numeric paragraph designation assigned by Harris.

**79. Petitioner was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the prosecution withheld credible exculpatory evidence, including evidence demonstrating, *inter alia*, that credible disinterested witnesses were available to substantially impeach the testimony of Joseph Demodica and that credible witnesses and other evidence were available to demonstrate that the subject robbery and murders were committed by persons other than the defendant. The evidence was highly exculpatory to both the jury's determination of petitioner's guilt and its consideration of the proper sentence. There is a reasonable probability that had the evidence not been withheld Mr. Harris' jury would not have convicted him and would not have sentenced him to death. The prosecution withheld the following exculpatory evidence, material to both the guilt and sentencing phase of trial:** [Subparts a-k, setting forth the alleged exculpatory evidence, are addressed in turn below].

This claim and its subparts are brought pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), in which the Supreme Court held "that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. Impeachment evidence as well as exculpatory evidence "falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985). "Favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

At the outset, the Attorney General for the State of Tennessee, on behalf of the respondent, contended that Harris' *Brady* claims were procedurally defaulted because they were never presented to the state courts. The Attorney General further noted that he could

not answer the *Brady* claims in detail because Harris did not adequately identify the documents supporting the *Brady* claims.

In response, Harris contended that he could not have raised his *Brady* claims in the state courts because the exculpatory evidence was not turned over to him during the state court process and thus his claims are not defaulted. Harris also moved to expand the record with exhibits from the Tennessee Bureau of Investigation's file and Gatlinburg Police records.

The court granted the motion to expand the record and found it appropriate for the respondent to address Harris' *Brady* claims on the merits. The respondent has now done so and the court will consider the *Brady* claims as set forth below. The exhibits from the TBI file and the Gatlinburg Police records are attached as Appendix 2 to Harris' Notice of Filing of Documents, Court File No. 266.

> **a. Contained within law enforcement files are police reports and witness statements showing that, contrary to the testimony of Mr. Demodica[1] at Mr. Harris's trial, victim Valentine was observed at the entry of the parking lot of the Rocky Top Motel, where he remained for a significant period of time. These police reports and witness statements further showed that the same eyewitnesses did not observe any other persons in the parking lot. Given the fact that Mr. Demodica's testimony had been substantially impeached during trial, and would have been even more so had trial court interference not rendered trial counsel's cross-**

---

[1] The Tennessee Court of Criminal Appeals and the Tennessee Supreme refer to this individual as Joseph DeModica, and this court has done likewise. In his habeas petition, Harris spelled the last name as Demodica..

3

> **examination of Mr. Demodica ineffective *see*, Paragraph 81(g), *infra*, there is a reasonable probability that Mr. Harris' jury would have rejected Mr. Demodica's description of Mr. Harris' involvement in the subject offenses. Absent Mr. Demodica's testimony, there was no credible evidence from which a reasonable juror could have found that the State had met its burden of proof as to each and every element of the offenses of which Petitioner was convicted.** (footnotes omitted)

This claim refers to unidentified handwritten notes that the occupants of room numbers 18 and 20 at the Rocky Top Village Inn saw Mr. Valentine, the security guard, in the parking lot across from the office around 11:00 p.m.; there was no mention that they saw anyone else. [Appendix 2, pp. 2- 3]. Apparently, Harris is claiming that the witnesses' failure to see DeModica and Ashley Silvers in the parking lot would have impeached DeModica's trial testimony, since he testified they were there arguing while Harris and Kim Pelley were with Mr. Valentine and Ms. Hill.

As Harris admits, DeModica was substantially impeached during trial. These notes, however, are consistent with DeModica's testimony. He testified that while he and Ashley Silvers were arguing in the parking lot, he saw Mr. Valentine drive up in the golf cart. [Addendum 2, Transcript of Evidence, vol. XII, pp. 810, 815-16]. In addition, the notes do not indicate that the witnesses did not see anyone else, but only that they saw Mr. Valentine. Accordingly, this evidence is neither material nor exculpatory under *Brady*.

> **b. Also contained within law enforcement files are statements from one Mr. Robert Charles, the owner of the stolen car which was *allegedly* used by Petitioner, Joseph Demodica, Rufus Doby (a/k/a Ashley Slivers), and Kimberly Pelley,**

4

> during the robbery and murders of which Petitioner now stands convicted and sentenced to death, indicating: (1) that Mr. Demodica was the person who had stolen the vehicle; that following that theft Mr. Charles had received a telephone call from a women [sic] identifying herself as "Kimberly" who informed him that she had found a checkbook belonging to Mr. Charles in a vehicle in which she was riding, that the presence of this checkbook led her to suspect that the vehicle was stolen, and that the vehicle was in the Knoxville, Tennessee, area; (3) that Mr. Charles had talked to "Kimberly" on a number of occasions, sometimes with her calling him and sometimes with Mr. Charles calling her; (4) that Mr. Charles had long-distance telephone records reflecting the times on which he called "Kimberly"; and (5) that, when Mr. Charles received his car back from Tennessee authorities he discovered letters from Ashley Silvers to Joseph Demodica, at least one of which expressed Ashley Silvers' love for Mr. Demodica, even though Mr. Demodica made Ashley Silvers "do bad things." The afore-referenced telephone records, which indicated that one of the calls, lasting three minutes, was made on the evening of the subject offenses, at a time when the State argued, and State witness Demodica testified, that Petitioner and Ms. Pelley were with Mr. Demodica in Gatlinburg, Tennessee.

This claim refers to a typed summary of the statement of Robert Charles given to Special Agent Dull. [Appendix 2, pp. 5-9]. Harris' characterizations of Mr. Charles' statement are incorrect. While Mr. Charles stated that Joey DeModica was the person who stole his car, he merely stated that he had received telephone calls from a female and that possibly her name was Kim. There is no mention in the statement that one of the calls was made on the evening of the murders.

Mr. Charles also stated that, when he received his car back from the authorities, there were personal belongings in the trunk and letters signed by Ashley, all of which he threw

5

away. There is no mention in the statement, however, that the letters were to Joey DeModica or that Ashley professed her love for Joey in the letters. Accordingly, this evidence is neither material nor exculpatory under *Brady*.

> **c. Also contained within law enforcement files are statements from a Mr. Robert Harrison indicating that the writing on a key piece of evidence, the "Maggie Valley Note" attributed by the State to the Petitioner, was similar to the handwriting of one Amy Carlton, that Ms. Carlton used to live with Mr. Harrison, that Ms. Carlton associated with Ashley Silvers, Mr. Demodica, and Petitioner, and that the envelope in which the "Maggie Valley Note" was found was similar to envelopes kept in his home.** (footnote omitted)

This claim refers to a typed summary of Robert Allen Harrison's statement given to Special Agents Dull and Zon. [Appendix 2, pp. 10-12]. There are also unidentified handwritten notes of an interview with Mr. Harrison. [*Id*. at 15-16]. Mr. Harrison stated that he had lived with Amy Carlton, and that on July 4, 1986, Ashley Silvers, Joey DeModica, and Harris were at Mr. Harrison's residence with Ms. Carlton. After being shown the Maggie Valley note, Mr. Harrison did state that the printing looked like Ms. Carlton's handwriting. He also stated that he had envelopes like the one in which the Maggie Valley note was found.

Apparently, Harris is contending that Ms. Carlton may have been involved in the murders of Mr. Valentine and Ms. Hill. There is no evidence, however, that Ms. Carlton or any other person was with Harris, DeModica, Pelley, and Silvers during the time frame of the murders. Those four were the only ones at Tim Farmer's house the night before and day

6

of the murders. [Addendum 2, Transcript of Evidence, vol. XII, pp. 984-989]. Accordingly, this evidence is neither material nor exculpatory under *Brady*.

> **d. Also contained within law enforcement files are statements from Tim Farmer, a witness at Petitioner's trial, which, contrary to his testimony at trial, stated that Petitioner left his home on the Wednesday before the subject offenses (not the Saturday of the offenses) and that the knife he observed in the possession of the Petitioner was not a serrated-edge hunting knife, the type identified by the medical examiner as being the weapon used in the subject offenses. Also contained within Prosecutor Schmutzer's file are a heretofore undisclosed composite sketch of a suspect who was similar in appearance to Tim Farmer and a heretofore unprovided statement from a former policeman, Jim Chambers, indicating that on the evening of the subject offenses his car had been struck from the rear by a *gray* automobile (not fitting the description of Mr. Charles' vehicle) driven by a person identified as Joseph Demodica, containing another person tentatively identified as Ashley Silvers, and two other persons, neither of whom were identified as either Petitioner or Ms. Pelley. The information which has existed in TBI files for over a decade, as well as the information contained in Mr. Schmutzer's file but not previously turned over notwithstanding Petitioner's earlier public records request, were clearly exculpatory. In fact, it substantially undercut the three main elements of the State's case. At trial the sufficiency of evidence to sustain Petitioner's conviction was wholly dependent upon the credibility of Mr. Demodica's testimony. Mr. Demodica testified that Mr. Harris and Ms. Pelley were the persons instigating and controlling the group's activities as well as the actual perpetrators of the murders of Mrs. Hill and Mr. Valentine. He also testified that the four co-defendants traveled to the scene of the crime in Mr. Charles' vehicle. The undisclosed evidence directly contradicts that testimony. That testimony is further undercut by the letters from Ashley Silvers to Mr. Demodica found by Mr. Charles. The language in the letter from Ashley Silvers to Joseph**

7

> **Demodica was startlingly similar to the language in the "Maggie Valley Note" to the effect that "Joey" made the author of the note shoot the victims and that "Joey" was mean. The trial court indicated that testimony identifying Petitioner as the author of the "Maggie Valley Note" was critical to his conviction. Finally, Tim Farmer was the only person who testified that Petitioner was in possession of the type of knife used in the subject offenses. The undisclosed evidence reveals that this testimony was directly contradicted by Mr. Farmer's earlier statements. This evidence also contradicts Mr. Farmer's testimony regarding Petitioner's presence in his home on the evening before the murders. Finally, it reveals that there was reason to believe that Mr. Farmer was himself a suspect in the subject offenses.** (footnote omitted)

With respect to Tim Farmer, this claim refers to a typed summary of Mr. Farmer's statement to the TBI [appendix 2, pp. 21-22] and typed interviews of Mr. Farmer [*id.* at 24-39]. These statements were admitted at trial [Addendum 2, vol. XIX, Collective Exhibit 52] and used by the defense during Mr. Farmer's cross-examination [*id.*, vol. XIV, pp. 1028-1034]. Clearly, there was no *Brady* violation as to Mr. Farmer's statements. In addition, there is no composite sketch within the records in Appendix 2 and thus Harris has failed to demonstrate a *Brady* violation in that regard.

With respect to Jim Chambers, this claim refers to a typed summary of Mr. Chambers' statement. [Appendix 2, pp. 40-42]. Mr. Chambers stated that, while stopped on a road about two blocks from the Rocky Top Village Inn in Gatlinburg and around 7:00 p.m. on the date of the murders, his vehicle was struck in the rear by a dark gray automobile. He was 90% certain the driver was Joey DeModica and he thought the passenger was Ashley Silvers; there were two persons in the back that he could not describe.

Mr. Chambers did not identify Harris as an occupant of the gray car. The testimony was that, at the time of the murders, Harris and his co-defendants were in the white Toyota stolen from Mr. Charles. [Addendum 2, Transcript of Evidence, vol. X, p. 799; vol. XI, pp. 805-809 (testimony of Joey DeModica); vol. XII, p. 944 (testimony of Tracey Clark); vol. XII, p. 972-975 (testimony of Jeffrey Tulle); vol. XII, p. 983 (testimony of Tim Farmer)]. Given that, the statement of Mr. Chambers is neither material nor exculpatory under *Brady*.

> **e.** **Also contained within law enforcement files are previously undisclosed latent fingerprints obtained from: (1) the flashlight allegedly used to render Mr. Valentine unconscious; (2) the "Maggie Valley Note" and the phone booth where it was located; and (3) the crime scene. Subsequent examination has determined that neither Petitioner nor Ms. Pelley was the contributor of any of these latent prints. The significance of this evidence cannot be overestimated. The State's entire case was premised upon testimony of Joseph Demodica to the effect that Petitioner and Ms. Pelley were the sole actual perpetrators of the subject offenses, that they were the only persons who went in the motel, and that it was Ms. Pelley who struck Mr. Demodica with the aforementioned flashlight. The fact that Ms. Pelley's and Mr. Harris' prints were not on that flashlight reveals the falsity of Mr. Demodica's testimony. Mr. Demodica further testified that it was Petitioner and/or Ms. Pelley, and they alone, who wrote the "Maggie Valley Note" and deposited the same in the phone booth where it was found. The note was sealed inside of an envelope when it was found. Petitioner is informed and therefore believes that neither Ms. Pelley nor Petitioner's fingerprints were those found on the letter inside of that sealed envelope, a fact which further demonstrates the falsity of Mr. Demodica's testimony.** (footnotes omitted)

This claim refers to a laboratory report prepared by Larry E. Hall, Senior Latent Examiner with the Tennessee Bureau of Investigation, with reference to fingerprints lifted from the motel room where the murders occurred and from the telephone booth in which the Maggie Valley note was found, as well as fingerprint impressions from the subjects of the investigation. [Appendix 2, pp. 42-48]. Mr. Hall was called to testify on behalf of Harris. [Addendum 2, Transcript of Evidence, vol. XVI, p. 1315]. He testified that he was unable to identify prints taken from the motel room, other than that of a paramedic, or the telephone booth; specific reference was made during his testimony to his report. [*Id*. at 1317-1323]. Clearly, there was no *Brady* violation as to Mr. Hall's laboratory report.

> **f.  Also contained within law enforcement files are police reports and witness statements tending to show that persons other than Mr. Harris, or any other of his alleged co-defendants, were responsible for the murders of Mrs. Hill and Mr. Valentine, and that law enforcement was unable to eliminate those persons as suspects, to wit, eyewitness statements that as many as four "bikers" were present in the immediate vicinity of the crime scene at the estimated time of the crime, physical descriptions of these "bikers", police artist sketches of these "bikers", witness statements that Mr. Valentine was involved in the sale of illegal drugs (including selling drugs from the rear office of the Rocky Top Motel), and witness statements alleging that Mr. Valentine and/or Mrs. Hill had used the room in which their bodies were found on prior occasions.** (footnote omitted)

There is nothing in Appendix 2 to suggest that Mr. Valentine was involved in the sale of illegal drugs or that, on prior occasions, he and Ms. Hill had used the room in which their bodies were found. With respect to the presence of bikers in the vicinity of the crime, this

claim refers to typed reports that the victims had been handcuffed with cheap handcuffs, the type commonly sold in souvenir shops and used as ornaments by motorcycle gangs and bikers; that during the time of the murders there was a motorcycle run in Cherokee, N.C., and that four bikers were seen purchasing handcuffs in a Gatlinburg shop; and that other shops in the area were investigated as to the purchase of handcuffs. [Appendix 2, pp. 77-79]. Later reports, however, exonerated various motorcyclists and others as suspects in the investigation. [*Id.* at 84-86].

The evidence at trial, however, indicated that Harris and his co-defendants had handcuffs before they went to Gatlinburg. Tim Farmer testified that he saw handcuffs on the rearview mirror of the white Toyota on Friday. [Addendum 2, Transcript of Evidence, vol. XIII, p. 1003]. In addition, Ashley Silvers stated that the handcuffs Harris had were ones she, Silvers, had purchased in Atlanta three years prior. [Addendum 2, vol. XIX, Collective Exhibit 50, Statements of Buddy Doby (Ashley Silvers), Re-Interview dated December 10, 1987]. Under the circumstances, the reports concerning bikers in the Gatlinburg area, and their purported purchase of handcuffs, are neither material nor exculpatory under *Brady*.

> **g.     The State also failed to disclose documents and other evidence which would have rendered inadmissible lay testimony by Mr. Harris' former girlfriend, Ms. Antonia Jones, connecting Mr. Harris to the so-called "Maggie Valley Note." The State had actual knowledge of Ms. Jones and her purported ability to identify Mr. Harris' handwriting weeks before Mr. Harris' trial, yet withheld that information from the defense in violation of Tennessee law. Moreover, the State affirmatively presented false and misleading testimony to the effect that Ms. Jones was not**

11

> **known to the State until five days prior to trial. There is a reasonable probability that had the Tennessee trial and appellate courts known of this misconduct the testimony of Ms. Jones would have been excluded.** (footnote omitted)
>
> h. **The State also failed to reveal critical evidence impeaching the testimony of Ms. Jones. During trial Ms. Jones was asked to provide, and purportedly did provide, a sample of her usual writing. The sample provided by Ms. Jones was in many ways similar to the writing in the Maggie Valley Note. The similarity between the writing of Ms. Jones' and the Maggie Valley Note was a feature of the State's closing argument and its significance was expressly noted by the trial court. Unrevealed by the State and unbeknownst to the defense Ms. Jones had made a written statement to law enforcement prior to testifying, which was written entirely in cursive and contained none of the distinguishing characteristics of the Maggie Valley Note. That statement revealed not only that Ms. Jones' ordinary writing was not similar to the writing purportedly written by Mr. Harris, but also that she had affirmatively attempted to mislead the jury during her testimony on direct examination.** (footnotes omitted)

These claims refer to Ms. Jones' testimony that she taught Harris to write and that he copied her printing while he was learning to write. Ms. Jones provided samples of her printing and testified that the printing on the Maggie Valley note was similar to Harris' printing.

Ms. Jones gave investigators a written statement, on May 4, 1988, five days before the trial began. [Appendix 2, pp. 97-99]. The fact that her statement was written in cursive does not impeach her testimony that she taught Harris to print.

In addition, there is nothing in the record to support Harris' claim that investigators knew of Ms. Jones weeks before trial. The record reflects that as soon as the State learned of Ms. Jones, defense counsel and the trial court were notified. [Addendum 2, Transcript of Evidence, vol. III, pp. 42-43]. The court ordered the testimony would be allowed and authorized defense counsel to employ a private investigator to investigate Ms. Jones. [Addendum 1, Technical Record, p. 67, order entered May 9, 1988]. Harris has failed to demonstrate a *Brady* violation in this regard.

> **i.** **There is a reasonable probability that had Ms. Jones' testimony been excluded, the result of Mr. Harris' capital trial and sentencing would have been different. Moreover, had the members of Mr. Harris' jury known of Ms. Jones' attempted deception and that her writing was in no way similar to that of the Maggie Valley Note, they would have placed little or no weight on her testimony and the result of Mr. Harris' capital trial would have been different.**

This subpart merely states a conclusion and does not state a claim for relief.

> **j.** **The State failed to reveal critical evidence regarding Petitioner's mental state at the time of his trial, evidence which was also relevant to his mental state at the [time] of the offense. Following his arrest and through the time of his trial, Petitioner's mental infirmities often required jail officials to administer anti-psychotic and anti-depressant medication. Moreover, jail officials had actual knowledge that Petitioner had been administered Thorazine, a powerful anti-psychotic drug. Had the State revealed this evidence at the time of trial trial counsel would have investigated, discovered, and presented evidence that Petitioner was suffering, and had throughout his life, suffered from severe mental illness, including, but not limited to, serious brain damage, and that he was mentally retarded. These**

13

> **infirmities rendered Mr. Harris incompetent at the time of trial and at the time of the offense. Had trial counsel known of Mr. Harris' mental infirmities, they would have also investigated, discovered, and presented evidence of Petitioner's extremely mitigating background. Had such evidence been presented there is a reasonable probability that Petitioner would not have been convicted and, if convicted, would not have been sentenced to death.**
> (footnotes omitted)

In his petition for post-conviction relief, Harris alleged his attorneys failed to investigate his medical history. [Addendum 11, Technical Record, pp. 1-18, Petition for Post Conviction Relief, § 12, subpart a. at 5]. In his brief on appeal from the denial of post-conviction relief, Harris alleged that he furnished defense counsel with information that should have prompted them to realize his serious mental and emotional impairments, such that further investigation was warranted; Harris specifically referred to jail records indicating that he was prescribed the anti-psychotic drugs Haldol and Thorazine. [Addendum 13, Brief of Appellant, § I., subpart A.8. at. 23-24]. Clearly, the information on Harris' mental impairment was available at the time of his trial and he has failed to demonstrate a *Brady* violation in that regard.

> **k. The withholding of all of this evidence entitles petitioner to a new trial and sentencing hearing.**

This subpart merely states a conclusion and does not state a claim for relief.

> **80. In violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, Petitioner was denied the effective assistance of counsel at the guilt phase of trial, the sentencing phase of trial, on appeal, and in post-conviction proceedings. In particular counsel failed to perform**

**reasonably, and there is a reasonable probability, sufficient to undermine confidence in the outcome of trial, sentencing, appeal, and post-conviction proceedings, that, had counsel performed reasonably, Petitioner would not have been convicted or sentenced to death, and/or would have received relief on appeal or in post-conviction proceedings. Specifically, counsel was ineffective for the following non-exclusive list of reasons:**

> **g. .... Counsel failed to obtain a crime scene reconstruction expert to testify that the conclusions reached by Dr. Blake were not consistent with the physical evidence, that such conclusions were not within the knowledge of Dr. Blake's area of expertise, and that such conclusions were not within the knowledge of a lay witness. ...** [Omitted allegations were addressed in the court's prior opinion].

This claim was pleaded in a conclusory fashion, without supporting facts or allegations, and thus is procedurally defaulted for that reason. As the Tennessee Court of Criminal Appeals noted in post-conviction proceedings:

> The appellant contends that counsel was ineffective for failing to request funds for an expert to review the findings of Dr. Blake, the State's expert in forensic pathology. However, the appellant does not state what, if anything, in Dr. Blake's report is erroneous or explain why his findings are suspect. The record reflects that, prior to trial, defense counsel examined Dr. Blake's reports and interviewed Dr. Blake. Again, we cannot conclude that counsel's performance was deficient.

*Harris v. State*, 947 S.W.2d 156, 166 (Tenn. Crim. App. 1996).

A habeas petitioner must develop the factual basis for a claim in state court proceedings. 28 U.S.C. § 2254 (e)(2). Harris having failed to do so with respect to this issue, he is not entitled to relief on this claim of ineffective assistance of counsel.

> **86. The jury instructions in this case at the guilt phase violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth**

Amendments to the United States Constitution. These unconstitutional jury instructions include, but are not limited to, the following:

> a. Definitions of premeditation, the presumption of innocence, and other terms or phrases which were inaccurate, incomplete, confusing, inadequately defined or tended to mislead the jury. E.g., Tr. 1440, 1444.
>
> d. Instructions which informed the jurors that deliberation could be formed in an instant. Tr. 1442.

Harris' claims that the instructions on premeditation and deliberation were misleading are based upon the decision of the Tennessee Supreme Court in *State v. Brown*, 836 S.W.2d 530 (Tenn. 1992), in which the court concluded it would be "prudent to abandon an instruction that tells the jury that 'premeditation may be formed in an instant'" since "the jury must also be charged on the law of deliberation." *Id*. at 543. The Tennessee Court of Criminal Appeals denied relief on these claims in post-conviction proceedings, finding that *Brown* was decided after Harris' conviction and should not be applied retroactively. *Harris v. State*, 947 S.W.2d at 174.

This is a state law issue and matters of state law are not cognizable in federal habeas corpus proceedings. The Sixth Circuit has recognized this limitation with specific reference to the *Brown* decision. *See Houston v. Dutton*, 50 F.3d 381, 385 (6th Cir. 1995) ("When and how state law applies to a particular case is a matter on which the state supreme court has the last word. No federal issues are implicated and no federal question is presented in determining whether a change in state law is to be applied retroactively.") (citations omitted).

Harris nevertheless contends that he was prejudiced by the misleading instructions because there was insufficient evidence of premeditation. In its prior opinion, however, this court found that there was sufficient evidence to convict Harris of first degree murder, which encompasses the elements of premeditation and deliberation. Harris is not entitled to relief on his claims of misleading jury instructions.

### e. Instructions that the jury could consider lesser included offenses *only* if it had decided that Petitioner was not guilty of the charged offenses.

In post-conviction proceedings, Harris claimed these instructions skewed the jury's deliberative process, especially since the jury was instructed that premeditation could be formed in an instant. According to Harris, the jury was not able to give any meaningful consideration to second degree murder as a possible alternative to first degree, premeditated murder. The Tennessee Court of Criminal Appeals found the issue lacked merit. "This court has repeatedly upheld the giving of so-called 'acquittal first' instructions." *Harris v. State*, 947 S.W.2d at 175 (citations omitted).

Harris does not offer any authority to support his claim that this instruction was unconstitutional. Accordingly, the conclusion of the Tennessee Court of Criminal Appeals was neither contrary to, nor did it involve an unreasonable application of, federal law and Harris is not entitled to relief on this issue.

Harris is not entitled to relief on his remaining claims; his petition for the writ of habeas corpus will be **DENIED** and this action **DISMISSED**.  Harris having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**.  28 U.S.C. §2253(c).

**AN APPROPRIATE ORDER WILL ENTER.**

                                                              s/ Leon Jordan
                                                    United States District Judge